[No. 11346. Department Two. February 9, 1916.]

ELIZABETH O'DONNELL, *Respondent*, v. HUGH McCOOL *et al.*,
*Appellants.*[1]

APPEAL—RECORD—ABSTRACTS—STATUTES. An abstract of the record
is not required in a case where the appeal was taken before the stat-
ute requiring the service of abstracts went into effect.

PLEADING—CAUSES OF ACTION—REQUIRING ELECTION — DIFFERENT
THEORIES. In an action to quiet title, plaintiff should not be required
to elect between a claim of ownership in land through open, notorious,
and adverse possession for the statutory period and a claim of owner-
ship based upon the payment of the purchase price although title was
taken in the name of another; since there is no inconsistency and
both lead to ultimate title resulting in one and the same judgment,
and not to a choice of remedies.

ADVERSE POSSESSION — HOSTILE POSSESSION — NECESSITY. Adverse
possession of land originally occupied under some arrangement with
the holder of the legal title is not established where during the en-
tire statutory period, the plaintiff recognized the title holder's right
to pasture stock on the land, her letters apparently recognized some
joint interest, and she acquiesced in his payment of taxes and the
last payment on the purchase price.

TRUSTS—RESULTING TRUSTS—PAYMENT OF PURCHASE PRICE. A re-
sulting trust from the fact that one party furnished money for the
purchase price of land, title to which was taken in another, cannot
arise as to the whole title, where the entire purchase price was not so
paid by one party.

SAME—RESULTING TRUST—PAYMENT OF PART OF CONSIDERATION—
EVIDENCE—SUFFICIENCY. A resulting trust to an aliquot part of a
tract of land arises where it appears that defendant, having paid
$800 for a relinquishment, placed plaintiff and her husband in pos-
session, that they furnished defendant $840, with which to buy the
land, and placed valuable improvements thereon, and that the parties
recognized common interests in each other; as there may be a result-
ing trust in land to a part less than the whole; and it is not unrea-
sonable, after the lapse of time, where there can be no absolute cer-
tainty as to the exact proportions each invested, to conclude from the
circumstances that the parties intended to invest in equal moieties.

Appeal from a judgment of the superior court for Stevens
county, Sullivan, J., entered February 5, 1913, in favor of

[1]Reported in 154 Pac. 1090.

the plaintiff, in an action to enjoin a foreclosure sale and to quiet title, tried to the court. Modified.

*Pedigo & Smith,* for appellants.

*Peacock & Ludden* and *Samuel Douglas,* for respondent.

FULLERTON, J.—This is an action instituted by Elizabeth O'Donnell against Hugh McCool, Mary McCool, his wife, and The First National Bank of Walla Walla, to restrain the sale under a decree of foreclosure of certain real property situated in Stevens county, and to quiet the plaintiff's claim of title to the property. From a judgment in favor of the plaintiff, the defendants appeal to this court.

The facts, as we gather them from the record, are in substance these: The lands in question lie within the belt and form a part of the lieu land grant made by the government of the United States to the Northern Pacific Railroad Company. In the summer of 1891, the land was occupied by one Hughes, who had made certain improvements thereon. The appellant Hugh McCool, desiring the property, purchased Hughes' improvements and his possessory or "squatter" right for the sum of $800, paying a part of the purchase price in cash and giving his note, payable at a future date, for the remainder. In the fall of the same year, McCool met the respondent and her husband, who were then with their family camping on a small creek near the land in question. They were searching for a tract of land which they could homestead or purchase. The husband of the respondent and McCool were first cousins, and had formerly been neighbors in the county of Walla Walla. On learning their errand, McCool suggested that they move onto the land that he had recently purchased of Hughes. On the next day McCool and O'Donnell rode over to look at the land, and shortly thereafter O'Donnell moved thereon with his family. No writing passed between the parties evidencing the conditions under which possession of the property was given O'Donnell, and

the living witnesses (O'Donnell, the husband, having since died) have no very distinct recollection of the conditions. Mrs. O'Donnell testified that they purchased the property from him, while McCool testified that he merely "let them take it if they would care for any stock I had there, and keep up the ranch." It is in evidence, however, that O'Donnell had at that time a considerable sum of money on deposit with the Big Bend National Bank of Davenport, and that he gave McCool privilege to draw upon the deposit to the extent of $900. Canceled checks in the record show that he drew upon the fund to the extent of $680, and while McCool testifies that this is all he received from the fund, Mrs. O'Donnell produced a check for an additional $200, drawn by her husband payable to himself, which she says was drawn for McCool's use, and the money paid over to him. These checks were all drawn during the fall of the year 1891.

After taking possession of the land, the O'Donnells, within the next few years, placed valuable improvements on the property. They fenced the entire tract, erected a nine-room house thereon, built a substantial barn, a stock shed and other outbuildings, planted an orchard of fifty or sixty fruit trees, and cleared, broke the sod, and placed under cultivation some seventy-five acres of the remaining land; improvements valued by the witnesses at from $2,500 to $3,500. The respondent and her husband resided upon and maintained possession upon the land until his death in 1898. Since that time the respondent has maintained such possession, actually residing upon the land for the entire period, except some four years and a half between 1902 and 1908, when she resided upon a homestead she had entered upon government land.

On May 1, 1896, McCool entered into a contract with the Northern Pacific Railway Company, the successor in interest of the Northern Pacific Railroad Company, for the purchase of the land. The consideration named in the contract was $640, to be paid in annual partial payments extending over

a period of ten years. The final payment was not made, however, until the year 1909. At that time McCool was indebted in considerable sums to the appellant First National Bank of Walla Walla. The bank also seems to have advanced to him the money necessary to make the final payment. But be this as it may, the deed from the railway company for the land ran directly to the bank as security, as both McCool and the bank concede, for the indebtedness at that time owing from McCool to the bank.

McCool paid all of the taxes assessed against the property from the time the O'Donnells moved thereon until the year 1909. He also testified that he had repaid all of the money advanced him by O'Donnell, although his testimony in that respect is disputed by Mrs. O'Donnell. During the first years of the O'Donnells' occupancy, McCool pastured a number of cattle on the premises and the surrounding country which were fed and cared for by the O'Donnells during the winter season; and during the entire period he has pastured work horses and saddle horses thereon, which were likewise cared for by the O'Donnells, some of such horses being on the premises at the time of the trial.

In 1902, James O'Donnell, a son of the respondent, wrote McCool inquiring what he wanted for the ranch, saying, "If you don't want too much I'm going to try to buy it." In 1909, the construction of a high school building was contemplated in the school district of which the premises formed a part, and considerable interest was manifested by the people of the district as to the place of its location. One of the sites selected as suitable was near the boundary of the premises, and one of the objections to the selection of the site seems to have been the lack of water. To overcome this difficulty, Mrs. O'Donnell proposed to allow them to pipe water from a spring arising on the premises, and to that end she wrote a letter to McCool, dated August 31, asking him to consent to a grant of the privilege. In the letter she says:

"I am writing you in regard to our consolidated High School.  I would like very much if you [could] be here on the 13 of Sept. to vote where it [is] to be located.  There are two sites at Fruitland, one joins this place, . . . and the only drawback is the water.  Hugh, if you can't come, if you will give me the privilege to give enough water for the school house, I think we will get the school . . . We will never miss the water they will take for the school house, . . . they haul water all the time for to drink from here.  The well water is not good, that is why they want water from the spring.  I know if you were here you would let them have it. . . . Let me know before the 13 of Sept. & try & come if you can.  It is money in our pockets."

It is true Mrs. O'Donnell denies writing certain of the sentences we have quoted, but in this we are afraid she has not been entirely frank.  Before her attention was called to the contents of the letter, she admitted that the signature to the letter was hers and that the letter was in her handwriting.  Unfortunately the original was lost during the course of the trial and the letter is in the record by copy, and we have not the privilege of personally inspecting it, but neither she nor any one else pretends to say that the objectionable sentences were interlined, or that they appeared to be in a different handwriting from that of the main body of the letter, which she admits having written.  Without further comment, it is sufficient to say that we have no doubt of the genuineness of the letter.  In the record is another letter which was written by a son-in-law of Mrs. O'Donnell concerning the same matter.  In this letter he speaks of the premises as property in which McCool has an interest; saying that he writes at the request of the directors of the different school districts interested, as they wished to know what he would ask for the right to pipe water from the spring on the premises to a contemplated school building.

On October 7, 1911, the appellant bank began an action to foreclose the lien evidenced by the deed to it from the railway company, alleging the deed to be a mortgage.  To

this action McCool and wife alone were made parties defend-
ant, and (McCool and wife making default therein), a de-
cree of foreclosure against them was entered directing a sale
of the property. An order of sale was issued on the decree,
when the present action was instituted for the purposes and
with the result before stated.

The respondent has moved to dismiss the appeal, basing
her motion on the fact that no abstract of record was served
on the respondent at or before the time he was required by
statute to serve his opening brief. But an examination of
transcript will show that the appeal to this court was taken
before the statute requiring the service of abstracts went into
effect. The statute did not in terms purport to apply to
pending appeals, and this court construed it, when formulat-
ing rules of procedure under it, as not so applying. We
are still of the opinion that the construction put upon the
statute was correct. The motion therefore must be denied.

It is the appellants first contention that the complaint of
the respondent sets forth two inconsistent theories; the one
founded on the doctrine of adverse possession, and the other
on the doctrine of a trust resulting from the payment of the
purchase price. At the opening of the trial, they moved the
court to require the respondent to elect upon which of these
theories she would proceed. The court denied the motion,
and its ruling in that behalf constitutes the first error as-
signed. But we think the ruling without error. Conceding
that the facts set forth in the pleading justified the plain-
tiff's claim of title to the property in issue, first, on the
ground that she had been in the open, notorious and adverse
possession of the property under a claim of right for the
period of the statute of limitations, and, second, on the
ground that she had paid the purchase price of the property
although title was taken in the name of another, no rule of
law prevents her from introducing evidence tending to show
both state of facts. Both could be true, and to prove the
one she was not compelled to contradict the other. The

ultimate inquiry was the ownership of the property, and there is no inconsistency in urging different sources of title, all of which lead to ultimate title in the plaintiff and result in one and the same judgment. It is not a case of an election of remedies. This doctrine applies only to cases where the plaintiff has a choice of remedies arising out of the same state of facts; a familiar example of which is a breach of a contract to perform some specific undertaking, where the party injured may choose between the remedy of damages and the remedy of specific performance. All of the cases agree that the two remedies cannot be pursued concurrently in the same action, or even concurrently in separate actions; but no case that has been called to our attention holds that a plaintiff may not plead and introduce proof upon different states of facts to establish the ultimate issue, although the facts may call for the application of different principles of law. Such was our holding in *Hutchinson v. Mt. Vernon Water & Power Co.*, 49 Wash. 469, 95 Pac. 1023, where it is said:

"In their complaint the plaintiffs based their right or title to the water on three grounds: (1) As riparian owners on the water course through which the water flowed; (2) as appropriators; and (3) under the contract as above set forth. The defendant moved the court to require the plaintiffs to separately state their several causes of action, and later to require the plaintiffs to elect on which of their several causes of action they intended to rely. These motions were properly denied. In actions to recover or establish rights in property, each independent source through which a plaintiff claims does not constitute a separate cause of action. The ultimate facts upon which the plaintiffs relied for a recovery in this case were their right or title to the water and the defendant's wrongful interference therewith. This cause of action was one and indivisible, regardless of the sources through which the plaintiffs might claim."

See, also, *Bernot v. Morrison*, 81 Wash. 538, 143 Pac. 104.

The trial court made no findings of fact on the merits of the case, and we have been unable to gather from the record the precise ground upon which the decree was rested. Two possible grounds are suggested on which the decree may rest, that of adverse possession and that of a resulting trust. It is on the first of these that the respondent's counsel principally rely to sustain the decree, and this claim we shall first notice.

Undoubtedly the respondent has been in possession of the premises for a sufficient length of time to cover the period of the statute of limitations, and it may be conceded that her possession has been open and notorious. But these conditions alone do not satisfy the statute. In this state possession of real property to ripen into title must not only be open and notorious, but it must be under color of title or claim of right and adverse to all other claimants. The facts recited, we think, conclusively show that the respondent's possession of this property has not been adverse to McCool. Not only has she recognized, during the entire period of her possession, his right to pasture stock upon the premises, but her letter of August 31, 1909, from which we have quoted, clearly shows that she then thought that he had such an interest in the property as to prevent her from conveying full title to the water arising thereon for the use of the contemplated high school. The letter of her son, written some years before this period, and the letter of her son-in-law, written during the period, bear evidence that her immediate family did not understand that she claimed to be, or was, the sole owner of the property. True, none of these letters recognize an absolute ownership in McCool—that of the respondent, since she speaks of the contemplated grant as being "money in our pockets," and the water taken, as "water we will never miss" indicates rather a joint or common interest than absolute ownership—but there is, nevertheless, in each of them, a recognition of some interest in

McCool, and any such recognition is contrary to a claim of adverse possession to the whole of the property. The fact, also, that McCool only recently paid that part of the purchase price of the land necessary to acquire title from the railway company, and paid the taxes on the whole of the property for the entire period of the respondent's possession, with respondent's acquiescence and knowledge, is also very persuasive of the conclusion that the respondent had not made it clear to McCool that her possession was adverse to his interests. Our conclusion is that the decree cannot rest on the rule of adverse possession.

Nor do we think the decree can be rested in its entirety on the alternative ground suggested by the respondent. A resulting trust is a trust implied by law from the transactions of the parties. It never arises out of contract or agreement that is legally enforcible, "but arises by implication of law from their acts and conduct apart from any contract, the law implying a trust where the acts of the party to be charged as trustee have been such as are in honesty and fair dealing consistent only with a purpose to hold the property in trust, notwithstanding such party may never have agreed to the trust and may have really intended to resist it." 39 Cyc. 104. While such a trust may arise from other transactions, it has its most frequent application to transactions where one party pays the purchase price of property and title thereto is taken in another. In the case before us, if there is a resulting trust at all, it arises in this latter way. But in any view of the evidence, it is clear that neither the respondent nor her husband nor both together paid the entire purchase price of the property. There could not, therefore, be title in respondent, in virtue of a resulting trust, to the whole of the property.

But there may be a resulting trust in land to a part less than the whole. *Croup v. De Moss*, 78 Wash. 128, 138 Pac. 671. When one party makes an oral contract with another

18—89 WASH.

that the latter shall buy a specific tract of land on their common account, furnishing him with an aliquot part of the money required for the purpose, and he purchases the property, but in violation of the agreement takes the title in his own name or in the name of a third person, a trust results in favor of the first person for such aliquot part. *Bailey v. Hemenway*, 147 Mass. 326, 17 N. E. 645. The evidence convinces us that such was the condition here. McCool had paid $800 to procure the release of Hughes. The sum of $640 was required to procure the interest held by the railway company. O'Donnell placed to McCool's use $900. Of this sum McCool concededly applied to his use $640, and there is reason to believe that he so applied $200 more. In addition to this, O'Donnell entered into possession of the property and at once began to place thereon, and within a short time did place thereon, valuable and permanent improvements. The parties have, also, down to a very recent period of time, recognized common interests in each other in the property. It is not reasonable to suppose that all this was done with the idea that O'Donnell was to be the mere tenant at sufferance of McCool. On the contrary, the transactions carry the idea of permanent rather than transient interests. After this lapse of years it cannot, of course, be known with absolute certainty the exact proportions each of the parties invested in the purchase price of the property; but looking to the indisputable evidence, not regarding too closely that depending upon the uncertain memories of the parties, the mind is led to the conclusion that the parties intended to invest therein in equal moieties. That the amounts were very nearly equal we think is proven, and that it is no injustice to either of the parties to so regard it. A trust, therefore, results in the respondent for an undivided half interest in the property.

The conclusion reached requires a modification of the judgment. The title to an undivided half interest only should have been quieted in the respondent, and a sale per-

mitted as to the other undivided half. The decree is reversed, and the cause remanded with instructions to modify the decree accordingly.

MORRIS, C. J., MAIN, and ELLIS, JJ., concur.