[No. 15874.    Department Two.    October 18, 1920.]

ELLEN BUCKLEY, *as Administratrix etc., Respondent,* v. MASSACHUSETTS BONDING & INSURANCE COMPANY, *Appellant.*[1]

INSURANCE (185)—ACCIDENT INSURANCE—CAUSE OF DEATH—MURDER—EVIDENCE—SUFFICIENCY. In an action upon an accident policy, a finding that the insured was murdered and was not a suicide, is sufficiently sustained by evidence that he was in good health and spirits, that, while carrying a large sum of money, and on the evening of his disappearance, he had an appointment with a stranger, with whom he was last seen, in company with another man of a criminal character, and his body was found eight days after in the river that runs through the city, with the large sum of money missing, although it was much less liable to have been accidentally dropped than other articles found on the body.

SAME (128)—ACCIDENT INSURANCE—UNLAWFUL DEATH AS "ACCIDENTAL." Death is accidental, within the meaning of an accident policy, where it is the result of injuries inflicted by a third person without the fault of the insured.

SAME (185)—ACCIDENTAL DEATH—PRESUMPTION—BURDEN OF PROOF. A death from drowning is presumed to be accidental, rather than from suicide, where the body is found under circumstances pointing to a sudden death from violent external causes or from drowning, where suicidal intent was contrary to the known disposition, temperament and business conditions of the insured.

PLEADING (163)—CAUSES OF ACTION—ELECTION BETWEEN CAUSES—CAUSE OF DEATH. Upon an issue as to whether insured met his death by bodily injuries sustained directly and independently of all other causes through accidental means (suicide included), it is permissible for plaintiff to show all the circumstances surrounding the death and she should not be required to elect between the theory of accidental drowning and wrongful death inflicted by another.

[1]Reported in 192 Pac. 924.

INSURANCE (131)—ACCIDENT INSURANCE—NOTICE OF DEATH—TIME FOR NOTICE. Where an attorney advised that an accident policy had lapsed and notice and proof of death would be unavailing unless a renewal receipt was found, and search therefor was made, and no renewal found until five weeks later, when notice of death was immediately given, it is a question for the jury to determine whether there was a sufficient excuse for the delay, and whether the notice was given within a reasonable time, within the requirements of the policy that immediate notice of death be given, and that the claim shall not be invalidated if it was not reasonably possible to give the notice and if notice was given as soon as reasonably possible.

EVIDENCE (82)—DEMONSTRATIVE EVIDENCE—ARTICLES ADMITTED TO EXPLAIN EVIDENCE. Upon an issue as to the cause of the death of one under circumstances indicating a murder, it is not error to admit, as illustrative of the evidence, a slugging instrument called a "sap", found in the building where deceased was last seen alive, the witness testifying that he had seen such an instrument in the possession of one of the persons last seen with the deceased.

TRIAL (71)—INSTRUCTIONS—WEIGHT AND SUFFICIENCY OF EVIDENCE—SPECULATION—CIRCUMSTANTIAL EVIDENCE. Upon an issue as to the cause of the death, upon which the evidence was circumstantial, it is not error, after properly instructing that the jury could not speculate or guess, to state that it is sufficient to show circumstances that lead ordinarily prudent men to believe that a thing happened in a certain way.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered December 13, 1919, upon the verdict of a jury rendered in favor of the plaintiff, in an action on an accident insurance policy. Affirmed.

*Danson, Williams & Danson (R. E. Lowe,* of counsel), for appellant.

*Plummer & Lavin,* for respondent.

FULLERTON, J.—On January 21, 1916, the appellant, Massachusetts Bonding and Insurance Company, issued an indemnity policy to one Michael J. Buckley, insuring Buckley for a period of twelve months "against bodily injuries sustained directly and independently of all other causes through accidental means

(suicide or any attempt thereat, sane or insane, not included).'' The policy provided for the payment of the principal sum of the policy to his estate in the case he should meet with an accident which resulted in death, and further provided for a renewal from term to term upon payment of the premium therein stated. At the end of the first period it was renewed for another term of twelve months.

In September, 1917, the respondent, Ellen Buckley, as administratrix of the estate of Michael J. Buckley, deceased, began the present action to recover upon the policy. In her complaint, after alleging the preliminary matters necessarily incident to a right of recovery, further alleged:

''That on to wit the 30th day of June, 1917, said Michael J. Buckley lost his life, resulting from bodily injuries sustained by him direct and independent of all other causes through accidental means, in this, that said Michael J. Buckley on said date accidentally fell into the Spokane river in Spokane county, Washington, and was either drowned by said fall which caused his death, or that, on or about said date, in said county and state, said Michael J. Buckley was murdered by persons to plaintiff unknown, by being struck on the head with some blunt instrument crushing his skull, the exact time and place of said murder being unknown to plaintiff.''

The appellant took issue upon the allegations of the complaint by answer. It denied the traversible allegations and interposed certain affirmative defenses, upon which the respondent took issue. After issue had been thus joined, a trial was had before the court sitting with a jury, which resulted in a verdict and judgment for the respondent. The appeal before us is prosecuted from this judgment.

The evidence on the part of the respondent tended to show the following facts:

Michael J. Buckley, at the time of his death, was an unmarried man, thirty-seven years old, five feet, nine inches, in height, and weighed approximately one hundred and eighty-five pounds. He was of a good natured, jovial disposition, peaceably inclined, temperate generally in his habits, and in good health, save that he had complained at times of having some sort of stomach trouble. He was at this time, and had been for some years prior thereto, the sole proprietor of a restaurant known as the Buckley Brothers Cafe, conducted by him in the city of Spokane. The business was prosperous and profitable. There were no outstanding obligations against it of any kind. The employees were paid weekly on Mondays, and the current bills were paid as they matured. The restaurant was kept open for business at all hours and was given close attention by Buckley. Among other employees, he employed two cashiers, one of them a young woman, whose hours were from nine o'clock in the morning until five o'clock in the afternoon. The other went on duty at eight o'clock in the evening and stayed until five o'clock in the morning. Between these hours Buckley usually attended to these duties himself. The young woman mentioned also acted as bookkeeper. She took charge of all of the cash received from the ordinary patrons of the restaurant, that taken in while others were on duty as well as that taken while on duty herself, and deposited it in a bank to the credit of Buckley Brothers. She also kept charge of the current bills of the restaurant, prepared for signature the checks issued for the payment of such bills, which Buckley from time to time signed. Certain receipts from the restaurant Buckley appropriated to his private uses. His restaurant was somewhat extensively patronized by soldiers stationed at the government military post located near the city

of Spokane, and these paid for meals served them with some sort of credit checks issued by the government. Buckley would collect the checks and at certain periods would send them to military headquarters, when a government warrant would be issued in their payment. These warrants Buckley cashed personally, and would either carry the money received from them on his person or deposit it to his private account in a bank other than the one in which the general receipts from the restaurant were deposited. Seemingly, also, no account of these receipts were kept on restaurant books.

On the day before his disappearance, Buckley was seen to have on his person a considerable sum of money. A part of it was in gold and a part in currency. The gold was in a purse which he carried in the hip pocket of his trousers, and the currency was carried in an ordinary bill book. This book, it was testified, he sometimes carried in his hip pocket and sometimes in the inside pocket of his coat. Buckley was at the restaurant on the morning of Saturday, June 30, 1917, when the woman cashier came into the restaurant on that morning to take up her duties. He was at the cashier's desk, performing the duties of cashier. When the woman relieved him he went into the back part of the restaurant, from which place he returned in a few moments and told the cashier that he was going out to purchase a crate of berries. He did not return to the restaurant, in so far as any of the employees testifying knew, nor did he send in the crate of berries. He was later seen near the restaurant, the witness being unable to fix the exact time, although his remembrance was that it was near the noon hour. The record gives no account of his whereabouts between that time and nine o'clock in the evening. At that time has was met on one of the principal streets of the city, not far from

his restaurant, by an old-time acquaintance. This acquaintance conversed with him for some fifteen minutes. He testifies that Buckley told him that he had an appointment with some men at a hotel with regard to a deal he was contemplating making for land in Montana; that they had not appeared, and that he was walking around killing time, expecting to meet them later. That Buckley inquired of him what he knew about land in the vicinity of Great Falls, Montana, and incidentally said, "I am carrying more money than I like to carry, but I might have occasion to use it in the land deal." He further testifies that Buckley did not tell him the name of the hotel at which he was expecting to meet the party, but that, at the time he met him, he was coming from the direction of a hotel known as the Staff. He also testified that Buckley's appearance was perfectly normal; that he came up in his usual cheerful way, and that he was the same Mike Buckley he had always known; that he smelled liquor upon him, but could not discover that he was in any degree intoxicated; that among other things talked about than those above mentioned were business conditions generally; Buckley saying, with reference to his own business, that prices were going up so high that it was cutting into the profits. The witness says they compared time by their watches, during the course of their conversation, and it was then a quarter past nine.

Buckley was met near the same place on the same evening by another acquaintance, who had also known him for a number of years. This person was a grain dealer, having his headquarters at a town in an adjacent county. He fixed the time of the meeting as being between the hours of nine and ten in the evening, although he thinks it was nearer ten o'clock than nine when they separated. He testified that, at this meet-

ing, they talked of different matters, but that he was able to recall only one of them: That, at a previous time, Buckley had mentioned to him that he had an opportunity to purchase some thirty thousand pounds of rice at a stated price, and at this meeting mentioned the matter to him again and asked him what he thought of the venture. The witness did not understand that Buckley was buying it for use in his restaurant, but as a speculation; that food products were then rapidly advancing in price and that Buckley's idea was to purchase it with the expectation of selling it later at a profit. He also testified that Buckley's appearance was normal; that he noticed no smell of intoxicants about him; that Buckley made no mention of a land deal, or that he was waiting for any one; that it was just a casual meeting, and possibly would not have been remembered by him but for the fact that the papers of the following morning contained an account of his disappearance.

Buckley was next seen by a taxicab driver shortly before midnight of the day mentioned. The driver testifies that a call came to the city service station from the Staff hotel for a taxicab, and that he went there in answer to the call; that, when he reached the place, Buckley, a man by the name of Marks, and a stranger, were waiting on the curb in front of the hotel; that the three got into the taxicab and Marks directed him to drive to the Elm hotel, a distance of about four city blocks; that, when they reached the hotel, all three of the persons got out; that Buckley paid the cab fare, taking a bill for that purpose from a roll of a considerable size; that he then drove away without noticing what direction the parties took after getting out of the taxicab. The witness testifies that he was well acquainted with Buckley, having known him for a num-

ber of years, and that he had known Marks for a con-
siderable time also: that there was no quarrel or loud
talking between the men while they were in the cab
and nothing so unusual in their conversation as to at-
tract his attention; that he had never seen Buckley
since that time, and could not recall of having since
seen the stranger; that they all appeared sober, and
that he observed nothing that indicated they had been
indulging in intoxicants.

Buckley's body was found eight days later in the
Spokane river, some seven and a half miles below the
city of Spokane. When found it was floating on the
surface of the stream, face downward, with the arms
extended. The clothing was not torn nor disarranged.
The watch, with its chain and charm, he was known to
carry in his lifetime was on his person—the watch in
his vest pocket, and the chain attached thereto and to
the vest in the usual manner. In the watch pocket of
his trousers was found a five-dollar bill, and in another
of his pockets was found a fifty cent piece of silver, or
silver in smaller denominations equaling fifty cents,
different witnesses giving different versions of the
fact. The gold and bills he was known to be carrying
were not found. The head of the corpse showed a
bruise or an abrasion, some five or six inches in length,
extending lengthwise of the head shortly to one side of
the median line. Beneath the bruise the skull was
fractured and crushed.

The Spokane river flows through the heart of the
city of Spokane. The river flows a considerable volume
of water, and from the center of the city for several
miles down stream it is rapid and turbulent, flowing
over a rock bed filled with large boulders. Sometime
before the death of Buckley, a dam was constructed
across the river some mile and a half below the place

where his body was found, which backed the water up stream for some three miles, forming a lake. Within the confines of the lake the water flowed evenly with a regularly moving current. The undertaker who took charge of the body of Buckley testified to a long experience in the undertaking business, and to the fact that in the course of his business he had received a number of bodies taken from the river. He testified that bodies falling in the river in or near the city and floating over the rapids mentioned were, when found, usually much bruised, denuded of their clothing, and at times even of their shoes. It was given in evidence, also, that, after the construction of the dam, a sediment had been deposited in the lake formed above it, and that Buckley's body and clothing when found had upon them sediment similar in character to that found in the lake.

The man Marks, with whom Buckley was last seen, was a person of shady character, criminally inclined, and had been under police surveillance for some time. He was then living in concubinage with a woman who, jointly with him, conducted the Staff hotel. In a raid made by the police on the Elm hotel some months after the death of Buckley, an instrument, called in the record a "sap," was found in one of the rooms. The instrument is in evidence. It is a piece of rubber hose, red in color, some sixteen inches in length, filled for about half its length with some heavy substance. A witness whose business frequently took him to the Staff hotel testified that he had seen Marks carrying upon his person a similar looking instrument shortly prior to the time of Buckley's disappearance.

Buckley, while in the conduct of his business, sometimes in the afternoon and sometimes in the early part of the night, would go to some hotel or lodging house,

of which there were a number near his place of business, and rent a room in which he would lie down for the purpose of rest or sleep, leaving directions to be called at a fixed hour later. The respondent's evidence tended to show that he patronized these places indifferently, partly, it was suggested, for business reasons, and partly because he could thus better keep his whereabouts unknown and not be subjected to calls at times when he desired rest.

The appellant's evidence tended to show that he was a frequent visitor at the Elm hotel, where he would pursue much the same course that he did at the other places mentioned. The appellant produced as a witness the then proprietress of the place. She testified that Buckley was at her place on the night of his disappearance; that, while she could not definitely fix the precise hours, her recollection was that he came after eight o'clock in the evening and left not later than eleven o'clock on the same evening; that he rented a room in the usual manner, although she intimates that, at this particular time, his purpose was to meet a woman roomer then in the house; that he was alone when he came and alone when he left, and did not afterwards appear there; that she did not know Marks and does not know whether he was in her house that night or not, but was certain no man was there in the company of Buckley; that Buckley was sober when he came and took no drinks while at her place, and that her best recollection was that he was in the house that night between one and two hours. Concerning the "sap," she testified that a woman occupying a room in her house had it made, and that it was found in the woman's room at the time of the officer's raid on her place. Police officers of the city, called by the appellant, testified to having seen Buckley at different times

under the influence of intoxicants. No one of them, however, saw him upon the day or the night previous to his disappearance, and the times fixed at which he was said to be intoxicated were somewhat remote from that particular time.

The appellant challenges the sufficiency of the evidence to sustain the verdict. Discussing first the theory of murder suggested by the complaint, it is argued that the conclusion that Buckley met with foul play cannot be reached by any just deduction from the evidence, but only by piling inference upon inference and presumption upon presumption. Specifically, its counsel say:

"It is possible, although there is no evidence on the subject, that the insured was murdered and his dead body thrown into the Spokane river, and that his body was robbed by his murderers; and it is possible that he walked over a precipitous bank along the Spokane river and fell into the water; and possible that other things may have occurred which would bring the death within the provisions of this accident policy.

"It is also possible that he died naturally in some resort in Spokane, and the inmates, fearing a police investigation, threw his dead body into the river, robbing the body first, or, if there were any purses, or any money in his pockets at the time, that they fell out while he was in the river or elsewhere; that he attacked someone who was armed with a deadly weapon, and as the result was killed; that while armed with a deadly weapon he attacked someone, and as the result thereof was killed; that he sat down on the edge of a precipitous bank on the Spokane river, or on the rail of a bridge, and through some sudden attack as the result of disease, fell into the water below, and many other conditions might be conjured, none of which would bring his death within the provisions of this accident policy."

But we cannot follow counsel in this line of reasoning. To our minds, the evidence was much more

definite and certain than the reasoning implies. Buckley had an appointment at an early hour in the evening with some one with whom he at least was negotiating in good faith for the purchase of a tract of land; he carried with him a considerable sum of money, anticipating that he might need it if the negotiations reached an agreement; the person did not meet him at the time appointed and he waited until a later hour; he was seen later in company with a stranger and a person with a criminal record; his body was found later in the river, some miles below the place where he was last seen, bearing evidence that it had been cast into the water near the place where it was found; the skull was crushed in a manner that it could hardly have been crushed other than by a blow from some murderous instrument in the hands of another; one of the persons last seen with Buckley carried such an instrument; the large sum of money he was known to carry was not found on the body, although, because of the manner in which it was carried, it was much less liable to have been accidentally dropped therefrom, either before or after he was cast into the water, than were certain other articles which were found intact thereon. It is true that eight days elapsed between the time Buckley disappeared and the time his body was found, but it is a well known physical fact that the body of a normal human being has a greater specific gravity than has water. The body of a person who falls into water and is drowned, or the body of a person cast into water immediately after a death caused by violent means, sinks below the surface of the water, and to the bottom if the water is not of too great a depth, and rises to the surface only after the processes of decomposition have equalized the counteracting forces. The time elapsing in this instance was not longer than is usually required for this decomposition to take place.

Manifestly, there are here facts from which murder can be legitimately concluded without extending inferences or presumptions beyond their legitimate effect. Such as must be indulged in follow directly and naturally from the facts shown, and one does not have to be piled upon another to reach the conclusion at which the jury arrived. Indeed, it seems to us that, were the review one on an appeal from a conviction of murder, the court of review would hesitate long before it would conclude that the conviction was without evidence sufficient to sustain it. It must be remembered that the respondent did not have to prove her case beyond a reasonable doubt. She had only the burden of proof. If she has made it appear by a preponderance of the evidence that her intestate met his death by unlawful means, she has met that burden. Our conclusion is that the jury were well warranted in so finding.

The appellant's counsel correctly state that there are exceptions to the general rule that the death of one person at the hands of another by violent means is an accidental death within the meaning of an insurance policy insuring against bodily injuries sustained directly and independently of all other causes through accidental means, but we cannot follow them in their further statement that there is here no evidence from which the jury could legitimately conclude that the death was not within the exceptions. Death is accidental within the meaning of an accident insurance policy, such as the one in question here, when it is the result of injuries inflicted by a third person without the fault of the person injured, but is probably not so, at least there is good authority so maintaining, where the injury was provoked by the person killed; where, for illustration, he was the aggressor in an assault, and was killed in a melee which followed. There is a seem-

ing conflict in the cases whether the burden is on the plaintiff to show that the death in such cases is without the exception; but, assuming that it is so, we think the plaintiff in this instance has met the burden. The presumption arising from the disposition and habits of Buckley, shown by the record, is against the conclusion that he would wilfully and wantonly assault another: On the other hand, there is a motive shown for a wilful assault upon him by another. He had a sum of money which it was the evident desire of that other to obtain. It may have been the original purpose to obtain it by means less criminal than murder; but, be this as it may, the purpose was, it is clear, to obtain it in any event. Again, if Buckley had been killed in the repulsion of a wanton or unprovoked assault made by him, the person killing him, if he possessed the ordinary instincts or feelings usually possessed by mankind, would not have attempted to conceal his body. Yet there was here such an attempt. It was carried a number of miles and cast into water where the chance of finding it was remote. Concealment of an act, which, owing to the circumstances, may or may not be criminal, has always been regarded as evidence that the act was criminal. But more than this, the entire evidence negatives the idea; it bears witness to the most criminal of all classes of homicide—murder in the perpetration of a robbery.

The jury also, we think, were warranted in finding for the respondent on the other theory suggested by the complaint, namely, accidental death by drowning. There is a presumption against suicide, self-inflicted injuries, or intentional homicide, and when the body of a person is found under circumstances pointing to a sudden death from injury or drowning, the death is presumed to have been caused by accidental means,

rather than by the intentional act of the person himself. In *Jenkins v. Pacific Mut. Life Ins. Co.*, 131 Cal. 121, 63 Pac. 180, the insured was found suffering from a gunshot wound, because of which he died two days later. No one saw the accident, and the manner in which the wound was inflicted did not appear, other than it might be inferred from the nature and location of the wound. It was held that there was, from these circumstances alone, sufficient evidence to make a *prima facie* case of accidental death entitling a finding in favor of the insurance claimant. The court said:

"The burden is undoubtedly on the plaintiff by the very terms of the contract to show that the wound was inflicted accidentally, but it is not necessary for him to make out his case, that he should produce the direct testimony of eye witnesses. If the circumstances placed in evidence, and the inferences to be drawn therefrom, and the presumptions arising thereon, point clearly to an accidental injury, the plaintiff has made out a *prima facie* case and is entitled to a finding in his favor. There is nothing, perhaps, in the character or location of the wound to indicate from a mere inspection of it that it was inflicted accidentally rather than willfully; but when we consider that it is contrary to the general conduct of sane men to take their own lives, and that all the presumptions are in favor of sanity and against crime, we are impelled to the conclusion that the insured must have received his injury as the result of an accident. In the absence of evidence to that effect, it will not be presumed that the insured purposely took his own life nor that he was murdered, and if he did not take his own life willfully, and his life was not taken by another under circumstances making it a crime, then, we think, his death must be attributed to accidental causes. (*Richards v. Travelers' Ins. Co.*, 89 Cal. 170.) That the courts will presume that the death was the result of an accident, when nothing more is shown than that it was brought about by a violent injury, and the character of such injury is consistent with the theory of accident, seems to be a rule upheld

by the great weight of authority. (*Traveller's Ins.
Co. v. McConkey,* 127 U. S. 661; *Mallory v. Traveller's
Ins. Co.,* 47 N. Y. 52; *Cronkhite v. Traveller's Ins. Co.,*
75 Wis. 116; *Traveller's Ins. Co. v. Sheppard,* 85 Ga.
751, 802; *Standard Life etc. Co. v. Thornton,* 100 Fed.
Rep. 582; *Stephenson v. Bankers' Life etc. Co.,* 108
Iowa 637; *Insurance Co. v. Bennett,* 90 Tenn. 256;
*Jones v. United States etc. Acc. Assn.,* 92 Iowa 652;
*Couadeau v. American Acc. Co.,* 95 Ky. 280; *Konrad v.
Union etc. Co.,* 49 La. Ann. 636; *Goldenkirch v. United
States Acc. Assn.,* 5 N. Y. Supp. 428.)    The finding
complained of is contrary to the evidence under the
rule and should have been the other way.''

In *Meadows v. Pacific Mut. Life Ins. Co.,* 129 Mo.
76, 31 S. W. 578, 50 Am. St. 427, it was shown that the
deceased left the depot for the purpose of boarding a
freight train standing in another part of the railroad
yard.    Shortly thereafter his mangled body was found
on the railroad track, indicating that he had been run
over by a moving train.    It was contended that there
was no evidence tending to show that the death was
accidental, or was not the result of his own negligence,
the insurance company offering many theories by
which the death could be accounted for, which would
bar recovery under the conditions of the policy.    From
a well reasoned opinion in which many authorities are
collated, we quote the following:

''The plaintiff showed beyond controversy that
Daniel Meadows died of violent injuries, which were
plainly visible upon his body; that the nature of these
injuries left no doubt that they were the sole cause
of his death and proper proofs were made.    Here he
rested.    He had made a *prima facie* case, unless we are
required to presume that because he was killed by
being run over by cars on a railroad track, he was
voluntarily exposing himself to unnecessary dangers
and was violating his agreement in regard to being
upon a roadbed of a railroad, within the meaning of
the policy.

"Such a presumption would destroy the presumption indulged by the law that Meadows was at the time exercising proper care for his safety. In the absence of all evidence to the contrary the law presumes that he was exercising due care for his protection. There is not a word of evidence tending to show he was intoxicated, or that he was robbed and murdered. He was a man of the full age of discretion and of business habits. Under such circumstances, the language of Judge Agnew in *Allen v. Willard*, 57 Pa. St. 374, is very pertinent. He says: 'The natural instinct which leads men in their sober senses to avoid injury and preserve life, is an element of evidence. In all questions touching the conduct of men, motives, feeling and natural instincts are allowed to have their weight, and to constitute evidence for the consideration of courts and juries.' "

*Couadeau v. American Accident Co.*, 95 Ky. 280, 25 S. W. 6, was a case of death by drowning. It was shown that the insured left his home for his place of business at the usual hour in the morning, in sound condition mentally and physically; that he was prosperous in his business, happy in his domestic relations, and was of temperate and industrious habits. After being missed for some weeks, his body was found in a river near his place of residence, without marks of violence upon it, with his watch and some money in his pocket and with a ring on his finger. The defense was that he was intoxicated on the day of his disappearance. The jury found for the representatives of the insured, and the trial court set the verdict aside as contrary to the weight of the evidence. This was held error by the appellate court; the court holding that the facts presented a question for the jury. In the course of the opinion it was said:

"It is settled law that mere 'circumstances, sufficient to support a verdict, should be submitted to the jury,' and that 'the plaintiff is not bound to prove his case

so clearly that it excludes the possibility of any theory.' (*Allen v. Willard*, 57 Pa. St., 380; *Whitney v. Clifford*, 57 Wis. 157.)

"In *Winspear v. Accident Insurance Company*, 6 L. R. Q. B. Div. 42, it was said: 'When a man is found dead in the water he may be presumed to have come to his death by drowning, and not by fits or otherwise.' The rule, therefore, seems to be that where a man comes to his death by accidental drowning, or by suicide, the presumption will be in favor of the accident, rather than in favor of the suicide. (*Mallory v. Travelers' Ins. Co.*, 47 N. Y. 52.)"

In *Mallory v. Travelers' Ins. Co.*, 47 N. Y. 52, 7 Am. Rep. 410, the action was brought upon an insurance policy issued upon the life of one W. S. Mallory. By the terms of the policy the assurer agreed to pay the sum named therein if the insured sustained a "personal injury caused by any accident within the meaning of this policy and the conditions hereunto annexed, and such injuries shall occasion death within three months after the happening thereof." The facts of the case, the rule applied thereto, and the application of the rule to the question now before us, sufficiently appear in the following excerpt from the opinion:

"There was no error in denying the defendant's motion for a nonsuit. No ground for such motion was stated, and in such a case the well settled rule is, that there is no error committed by denying it, although there may be a defect in the plaintiff's proof, if the defect was such that it might have been supplied if pointed out upon the motion. But there was no such defect. The proof showed that the deceased had been staying at his brother's at Bridgeport, Conn., for about a week; that he left the house on Sunday, and was last seen alive on that day, walking toward a railroad bridge over a culvert, across a stream emptying into the sound, where the waters of the sound set, to some extent, into the land, and up the stream at high tide; that this bridge was used by pedestrians to cross the

stream to a considerable extent; that the body of the deceased was found in the pond not far from the bridge, in a few days thereafter. The policy was one embracing cases only where the death was caused by an injury received from an accident. From the facts above it appeared either that the death was caused by such an injury or the suicidal act of the deceased; but the presumption is against the latter. It is contrary to the general conduct of mankind; it shows gross moral turpitude in a sane person. That it resulted from the former cause was to some extent rendered more probable by the wound upon the head of the deceased, and the break in the corresponding part of his hat. Although this wound might have been made after the deceased was in the water, or while falling in, yet it was for the jury to say how it was caused, and to determine its effect upon the question whether the death was the result of an accidental injury, or whether the deceased had destroyed his own life.''

In 1 C. J. 495, the learned author of the text states the rule as follows:

''The fact of death does not of itself create any presumption that it was the result of an accident; and where in order to make out plaintiff's case, it is necessary to base a presumption that death resulted from an injury on a presumption that the insured sustained an accidental injury, no recovery can be had. Where, however, it is apparent that the injury to or death of the insured was the result of external and violent means, and the issue is as to whether it was due to an accident, within the meaning of the policy, or to some cause excepted by the policy, the presumption is in favor of accident and against the existence of facts bringing the case within any of the exceptions of the policy, such as insanity of the insured, intentional injury inflicted by a third person, lack of due care and diligence, self-inflicted injuries, and suicide. These presumptions may, however, be overcome by facts and circumstances establishing the contrary.''

Our own case of *Starr v. Aetna Life Ins. Co.*, 41 Wash. 199, 83 Pac. 113, 4 L. R. A. (N. S.) 636, is also in point. The action was upon an accident policy insuring against death resulting from external, violent and accidental means. The facts disclosed that the insured, at the time of his death, was at the town of Hatton, Adams county. At about four o'clock in the morning he started for the depot of the Northern Pacific Railway Company, with some companions, intending to take a train going to Spokane, which was then about due. It was then dark. Shortly after reaching the depot and before the arrival of the train, the insured left his companions, and when the train arrived could not be found, although search was made for him. Shortly after the train left the depot, some men at the depot heard the insured calling, and soon thereafter he was seen coming to the depot from the direction in which the train came, with both arms hanging limp and in a crushed condition. The insured died from the effect of his injuries within two days thereafter. At the trial, the foregoing facts appearing, the court took the case from the jury on a challenge to the sufficiency of the evidence. We held this error, saying in the course of the opinion: "A *prima facie* case having been made out by the appellants, the negligence of the insured in violating any of the excepted causes in the contract must be proven by the respondent."

So, in the case before us, if we should disregard the evidence pointing to the commission of a crime and consider only the evidence relating to the insured's disposition and temperament, the condition of his business, his sudden disappearance, and the fact that his body was found later in the river, bearing no marks of injury other than one which could hardly have been inflicted by himself except through a fall upon some

blunt object, there was evidence from which the jury could well have found that the death was the result of an accidental falling into the river, rather than the voluntary casting himself therein with suicidal intent.

And here we may notice the contention of the appellant that it was error on the part of the trial court to refuse, on its motion therefor made during the progress of the trial of the case, to require the respondent to elect on which of the theories stated in the complaint she would rely for a recovery, and that it erred in instructing the jury that it was not incumbent upon the respondent to show that the insured met his death in any particular manner, but if she has shown by a preponderance of the evidence that he met his death in either one of the ways stated in the complaint, her proofs were sufficient, under the terms of the insurance policy, to warrant a recovery. But we cannot think the contentions well founded. The ultimate question for the jury to determine was whether the insured met his death by bodily injuries sustained directly and independently of all other causes through accidental means (suicide or any attempt thereat, sane or insane, not included), and not the particular means by which the death was met. This being the ultimate issue, it was permissible to show all of the circumstances and conditions surrounding the death and permit the jury to say in what manner it occurred, since each of the ways in which it could have occurred were equally within the conditions of the policy. The language of the supreme court of Pennsylvania in *Taylor v. General Acct. Assur. Corp.*, 208 Pa. St. 439, 57 Atl. 830, is pertinent:

"Nor is it indispensable that they (the circumstances surrounding the death) establish a specific one of a number of accidental causes equally reasonably suggested by the evidence. It must be enough if they

fairly exclude design or disease as a cause inferable consistently with the evidence, and thus justify the conclusion that the occurrence is to be referred to the general head of accident. In this sense—where the process of elimination applied under the evidence removes the inference of design or disease and yet the proofs do not single out any particular one of a variety of fortuitous occurrences capable of accounting for the result consistently with the evidence, i. e. where it is satisfactorily shown that there must have been an accident, but, as among a number of reasonably supposable species of accident, it is unknown which occurred—it is certainly accurate to say . . . that a case of death or injury proceeding from an unknown cause is a case of accidental death or injury.''

The complaint but states different grounds authorizing a recovery. Under the practice in this state, where a plaintiff has two or more distinct grounds for the relief he asks, the one not inconsistent with the other, he may set forth all of them in his complaint in orderly sequence, and may recover if he proves any one or more of them. *Barto v. Nix,* 15 Wash. 563, 46 Pac. 1033; *Hutchinson v. Mt. Vernon Water & Power Co.,* 49 Wash. 469, 95 Pac. 1023; *Bernot v. Morrison,* 81 Wash. 538, 143 Pac. 104, Ann. Cas. 1916 D. 290; *O'Donnell v. McCool,* 89 Wash. 537, 154 Pac. 1090; *Starwich v. Ernst,* 100 Wash. 198, 170 Pac. 584; *Welch v. Northern Bank & Tr. Co.,* 100 Wash. 349, 170 Pac. 1029; *Hurley-Mason Co. v. Pacific Com. Co.,* 111 Wash. 439, 191 Pac. 624.

Any other rule would give the defendant an undue advantage. If the plaintiff is required to elect, he elects at his peril; since, if he is unsuccessful on his chosen ground, he cannot retry the cause upon another, and it would enable the defendant to defeat him, not by a showing of non-liability, but by a showing that he was liable for another reason than the one assigned.

No correct theory of code practice supports a rule so unreasonable and unjust. Nor are the theories in this instant inconsistent, as the appellant argues. They arise from the circumstances surrounding the case, permissible under the rules of evidence to be shown, and the evidence tending to prove the one does not stultify or contradict the evidence tending to prove the other.

The appellant next contends that notice of the death was not timely given under the terms of the policy. The policy provides that, "in the event of accidental death, immediate notice thereof must be given the company," and further, that "failure to give notice within the time provided shall not invalidate any claim, if it shall be shown not to have been reasonably possible to give such notice, and that notice was given as soon as it was reasonably possible." The evidence on the question shows that, within a few days after the finding of Buckley's body, the policy was found in his safe at the restaurant; that it was immediately taken to the attorney acting for the respondent in the administration proceedings; that this attorney, after examining it, informed the respondent that it had expired on its face, although providing for a renewal, and unless a renewal receipt was found, proofs of death under the policy would avail nothing. Search was then made for a renewal receipt, which was found some five weeks later, wrapped up in an abstract of title to real property, which had not theretofore been examined. Notice and proofs of the death were thereupon immediately given and made. It is undoubtedly the rule that, when a policy of insurance requires immediate notice of the death or injury, notice must be given within a reasonable time, and that compliance with the requirement is a condition precedent to a recovery on the policy.

It is probably the rule, also, that notice given five weeks after the injury or death, without a good excuse shown for the delay, would constitute a breach of the condition as matter of law. But we think there was here a sufficient excuse; sufficient, at least, to make it a question for the trier of the fact. The only objection that can be urged is that the search for the renewal receipt was not sufficiently diligent or careful. The evidence shows a search for many days, in all the places where it was thought it likely to be, and that its final discovery was but little more than an accident. We are clear that the court did not err in submitting the question to the determination of the jury.

The appellant objected to the admission in evidence of the so-called "sap," and moved at the close of the evidence to withdraw it from the consideration of the jury and strike all of the evidence pertaining to it. Error is assigned on its refusal so to do, but we cannot think it to be error. As we read the record, the court did not admit it on the theory that it was shown to have any connection with the murder of Buckley, but for illustrative purposes only; as a plat of the location of an accident, a model of a machine, or as any other illustrative design or thing is admitted. Such matters are admitted in evidence on the theory that they explain the evidence, and perhaps because occular evidence is generally more understandable than is descriptive evidence. The fact that this particular thing appears to have been made for use as an offensive or defensive weapon, and not for the purpose of illustration, does not alter the rule. A witness had testified that he had seen in the possession of one of the persons last seen with the deceased an instrument of this sort, and after describing it as best he could, testified further that it resembled this. Clearly, we think it is admis-

sible for the purposes for which it was permitted to be introduced. But had it been introduced as having some connection with the death of Buckley, we could hardly conclude it error. When it is remembered that Buckley was last seen in front of the building in which it was found, that he was a frequent visitor at that place, that this fact must have been known to the persons last seen with him, and the seemingly unnecessary trouble the persons last seen with him went to in order to make it appear that he was last in this particular house, it is not beyond the range of a permissible deduction to infer that the instrument was subsequently left in the place where it was found to cast suspicion on others than the real perpetrators of the crime. But, be this as it may, we cannot conclude that it was inadmissible as evidence on the theory it was actually admitted.

The appellant complains of the refusal of the court to give certain requested instructions, and of certain of the instructions actually given. The great number of these require no special consideration. The instructions refused absolutely were founded on a theory which we have hereinbefore concluded to be unfounded, and as to others, it is sufficient to say that they were covered in substance by the instruction given by the court. The instructions given to which exceptions were taken, we are clear, correctly state the applicable rules of law. The appellant, however, lays particular stress upon the following:

"While in deciding the question submitted to you for determination, your decisions must be based upon the evidence introduced in this case, and the law does not permit jurors, in reaching a decision to guess or speculate, still it is not necessary that all of the evidence be the evidence of eye-witnesses, or absolutely positive in its character. Evidence may as well be circumstantial or inferential, and if circumstances shown by the evi-

dence in this case lead ordinarily reasonable and prudent men to believe that a thing happened in a certain way, it is sufficient to establish that fact. Such circumstances, however, must have a direct bearing upon the cause of death, although every detail producing death or its cause is not required to be shown. The jury may consider all inferences which may reasonably be drawn from positive evidence or circumstances in the case and have the right to reason from cause to effect, in the absence of positive evidence, for the purpose of determining what the ultimate facts are.''

Concerning this, counsel say:

''We submit that this instruction is clearly erroneous and decidedly prejudicial. It would have been better for appellant had the court given no instruction whatever on the question of guess and speculation. To ordinary men this instruction is nearly, if not entirely, equivalent to telling them that they may guess and speculate for the purpose of determining any question. It is not the law that a question in a court of law can be determined by evidence that 'leads ordinarily reasonable and prudent men to believe that a thing happened in a certain way.' This is but another way of saying to the jury: 'The evidence is before you, and, if you believe that a certain thing happened you may so find, even though there is no evidence on the question which necessarily requires that result.' ''

We cannot think this criticism just. While the thought expressed by the language used might have been better expressed by language more definite, the instruction contains no positive misstatement of law. Manifestly it does not authorize the jury to guess or speculate for the purpose of determining any question of fact, and it is equally manifest that it does not authorize the jury to find as fact what they believe to be fact, though there be no evidence in its support. If the instruction is faulty in any particular it is faulty because of matters which it does not contain. But this

is not a material question here. What it lacks is supplied elsewhere in the instructions given, and under the practice as we have heretofore announced it, omissions in one instruction can be supplied by statements in another.

There are other minor questions discussed in the briefs, but as this opinion has now reached an undue length, we shall not notice them specifically. It is sufficient to say that we have examined them and find them unfounded. Our conclusion is that the record is without substantial error, and that the judgment should be affirmed. It is so ordered.

HOLCOMB, C. J., BRIDGES, MOUNT, and TOLMAN, JJ., concur.