[No. 33064. Department One. March 24, 1955.]

VILMA LINDBERG, *Appellant,* v. WILLIAM HIETALA *et al.,*
*Respondents.*[1]

*Howard J. Thompson* and *Orvin H. Messegee,* for appellant.

OTT, J.—This action was instituted by appellant to establish a *pro tanto* interest in real estate through a resulting trust. The cause was tried to the court. This appeal is from a judgment denying the relief sought.

The appellant is a widow fifty-three years of age. A ten-year-old boy resided with her. After the death of her husband, she and the boy moved from Mullan, Idaho, to Seattle. They took up residence in the home of her sister and her husband, who are the respondents here.

The respondents had purchased a home in Seattle, on contract, for twenty-five hundred dollars. At the time appellant arrived in Seattle, $384.64 had been paid on the purchase price. One monthly payment was delinquent, but arrangements had been made for an extension of time, and there was no threatened forfeiture. June 16, 1948, approximately two weeks after appellant took up her residence

[1]Reported in 281 P. (2d) 861.

with respondents, she volunteered to pay the contract in full. The payment was in the sum of $2,115.36. The deed establishing title in the respondents was promptly recorded.

Appellant's testimony leading up to the payment of the money was substantially as follows:

After her husband's death, appellant was lonesome and solicited her sister if she and the boy might move to Seattle and live with respondents. They were willing, and her sister went to Mullan to help appellant move. Appellant and the boy started living in the home of respondents about June 6, 1948. No arrangement was made as to the payment of the household expense or how much of the cooking, washing, and cleaning would be expected of appellant, except that she testified she expected to do her share of the work and to pay her share of the actual living expense. No arrangement was made concerning room rent prior to their arrival. Shortly after June 6th, appellant learned of the unpaid balance on the contract. She testified:

"Q. Did you and Mrs. Hietala, or you and Mr. Hietala, have any discussions relative to payment of the balance of the house contract? A. That the— I was to have— I was to have a home there. Q. You were to live with them, were you? A. Yes. . . . Q. Let me ask you: Whose idea was it, yours or theirs, you would pay the balance of the contract? A. Well, we talked about it together. . . . Q. How long, then, did you continue to live in the home? A. I was there for about a year and a half. . . . Q. And why did you leave the Hietala home? A. Things got too unpleasant. I just wanted to."

On cross-examination, appellant testified:

"Q. That was the understanding, you would always have a place and not have to pay rent and have a home as long as you lived, and— A. To do my share. Q. And you agreed to that? A. And I did."

Testimony in behalf of respondents concerning the payment of the balance of the house contract was as follows:

Mrs. Hietala (respondent wife): "Well, when she [appellant] came she said that she wanted to put that money down on the house, that she would have a home for her and her foster son, and she would spend the money—'The money would go and that way I wouldn't have it, but this

way I know I have a home and I know I can stay with you always,' which we said she can."

Joyce Peck (respondents' daughter): "Q. Did you live at your parents' home all the time that Mrs. Lindberg lived there? A. Yes. . . . Q. And when she got there did you overhear any conversations that Mrs. Lindberg had with your parents about paying off the balance of that contract? A. With my mother, yes. Q. Would you state what you overheard? A. Well, I heard Mrs. Lindberg say she would like to pay off the balance on the home in order that she might have a home there. Q. Any particular— Any additional statements made by her? A. Well, that she would spend the money eventually one way or another and that she just as soon have it where she knew where it was."

Barbara Gillis (a neighbor): "Q. Just state what you heard Mrs. Lindberg say, and what was said in Mrs. Lindberg's presence. A. She stated it was to be her home as long as she wanted to live there, and I don't know the amount of money, but she would put up money on the house."

With reference to appellant's leaving the home of respondent, Mrs. Hietala testified:

"Q. Did you go to her place of work after she left in an endeavor to find out why she didn't come back, and to get her to come back? A. Yes, I went and asked her, and begged her to come back. She said, No, I am too far, I can't come any more. Q. She was what? A. Too far gone. Q. Did you make any objection at that time? THE COURT: Too far gone. What do you mean by that? A. She had done quite heavy drinking, and I begged her to come. THE COURT: I want to find out about this. Is this what she told you, or is it what you thought? A. I went to her and asked her to come, and then I said what are you going to do. She said leave everything the way it is. If I haven't got any place else to go I can always come back to you. I said, Yes, you can. That is the last, before I had this here notice."

Mr. Hietala testified:

"Q. Are you agreeable that Mrs. Lindberg return to your home to live? A. Yes sir."

After appellant refused to return to respondents' home to live, she sought the advice of an attorney. At her request,

a letter, dated May 11, 1950, was written to respondents demanding repayment of the money advanced, and concluding:

". . . and if I do not hear from you within the next ten days, action will be commenced against you to collect the *money due* Mrs. Lindberg." (Italics ours.)

From all of the testimony in the case, the court found that

". . . the parties did not intend that the plaintiff should have any interest or title in the real property. . . . The evidence clearly indicates that the parties did not intend that a trust should be created."

With this finding of the trial court, we are in full accord.

In *Walberg v. Mattson,* 38 Wn. (2d) 808, 812, 232 P. (2d) 827 (1951), we said:

"The general rule is that where property is taken in the name of a grantee other than the person advancing the consideration, in the absence of other evidence of intent, the grantee is presumed to hold the legal title subject to the equitable ownership of the person advancing the consideration. [Citing cases.]"

To the same effect are *Creasman v. Boyle,* 31 Wn. (2d) 345, 354, 196 P. (2d) 835 (1948), *Donaldson v. Greenwood,* 40 Wn. (2d) 238, 249, 242 P. (2d) 1038 (1952), *Lalley v. Lalley,* 43 Wn. (2d) 192, 196, 260 P. (2d) 905 (1953), *Grichuhin v. Grichuhin,* 44 Wn. (2d) 914, 917, 272 P. (2d) 141 (1954).

A resulting trust is a trust implied by law from the transactions of the parties. It never arises out of a contract or an agreement which is legally enforcible. *O'Donnell v. McCool,* 89 Wash. 537, 154 Pac. 1090 (1916); *Farrell v. Mentzer,* 102 Wash. 629, 174 Pac. 482 (1918).

It is quite clear that the parties had an agreement that, upon the payment of the balance of the contract, the appellant would have a place to live as long as she cared to stay. She voluntarily left.

From the evidence, we hold that a resulting trust cannot be implied.

The judgment is affirmed.

HAMLEY, C. J., SCHWELLENBACH, DONWORTH, and FINLEY, JJ., concur.