[No. 15574. *En Banc.* July 8, 1920.]

HURLEY-MASON COMPANY, *Respondent*, v. PACIFIC COMMISSARY COMPANY, *Appellant*, E. G. LINDBERG, *Intervener and Appellant*.[1]

PLEADING (30)—COMPLAINT—DUPLICITY. A complaint in an action on an account stated is not duplicitious from the statement of facts not inconsistent, constituting a cause of action without reference to the account, upon which plaintiff may recover, although the account stated was not proven.

APPEAL (389)—REVIEW—AMENDMENTS REGARDED AS MADE. In an action tried de novo on appeal, the supreme court must regard a complaint upon an account stated to have been amended to conform to proofs showing plaintiff entitled to recover upon another ground without reference to the account.

CORPORATIONS (214)—ASSIGNMENT FOR CREDITORS—AUTHORITY OF OFFICERS AFTER ASSIGNMENT. After a corporation has become insolvent and made an assignment for the benefit of creditors, its secretary is without any authority to bind it by making a new contract with a creditor agreeing to pay an account and amounting to an account stated.

EVIDENCE (95)—ADMISSIONS—BY CORPORATE OFFICER. After a corporation has become insolvent and made an assignment for the benefit of creditors, a letter written by the secretary of the corporation agreeing to pay a claim is not admissible as independent evidence of a declaration or admission by the corporation that the claim was a just obligation.

ACCOUNT, ACTION ON (3)—EVIDENCE. The statement of an account by a government field officer who was keeping the account by

[1]Reported in 191 Pac. 624.

agreement as agent for both parties is prima facie evidence, as between the parties, of the correctness of the account, although he was not sworn as to its correctness.

SAME. The statement of an account by an auditor acting for both parties, showing items of merchandise not paid for, is not impeached by the evidence of an officer of one of the companies that all items of merchandise taken from the commissary and applied to its private use had been paid for, where information as to the state of the account was derived wholly from the auditor, and it could not be known that the payments were in full.

CONTRACTS (11)—REQUISITES—IMPLIED CONTRACTS—REPUDIATION OF GOVERNMENT CONTRACT. Where the government had a direct interest in an agreement between a construction company and a commissary company for the messing of officers at a military post, and agreed to reimburse the construction company for its expenditures in giving the commissary company free use of facilities, there could be no implied contract on the part of the commissary company to pay for such use, should the government repudiate its promise and charge the cost to the construction company or refuse to allow the cost thereof in its settlement with the construction company.

CONTRACT (131, 151)—OPERATION AND EFFECT—PERFORMANCE OR BREACH—ACTS CONSTITUTING BREACH. A promise by a construction company to present in its own name, when its own claims had been adjusted, a claim of its subcontractor, a commissary company, against the government, does not relieve the subcontractor of its obligation to the construction company; nor is the same breached until its own claims were adjusted.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered June 6, 1919, upon findings in favor of the plaintiff, in an action for equitable relief, tried to the court. Reversed in part.

*Stiles & Latcham,* for respondent.

*Peters & Powell,* for appellant Pacific Commissary Company.

*Donworth, Todd & Higgins* and *W. E. Froude,* for appellant Lindberg.

FULLERTON, J. — In June, 1917, the respondent, Hurley-Mason Company, entered into a contract with the government of the United States for the construc-

tion of the buildings and other utilities the government desired to have constructed at the site of the army post in Pierce county, afterwards known as Camp Lewis. By the terms of its contract, the construction company obligated itself to establish a commissary at the site of the construction work for the purpose of supplying meals and lodgings to such of its employees as might desire the service. No rate of charge was fixed by the contract for the service to be furnished the employees, although the contract provided that the revenue derived from the commissary and the utilities connected therewith should be applied in reduction of the cost of its operation; the government agreeing to reimburse the construction company for its net expenditures incurred in such operation. The contract further provided that the title to all completed work and all work in the course of construction should be in the United States. It also provided that all subcontracts should be in accordance with the agreement between the government and the construction company, and that all such contracts should have the approval of the contracting officer of the government.

On July 10, 1917, the construction company, with the approval of the constructing quartermaster of the post, sublet the work of conducting the commissary to the appellant Pacific Commissary Company. By the terms of the contract, the commissary company agreed to buy all of the provisions and supplies necessary to be used in the work, prepare and serve meals to the construction company's employees, and to do the janitor work connected with the lodging places. The construction company, on its part, agreed to pay the costs of the provisions and supplies, and, as a consideration to the commissary company for its services, agreed to pay it for each meal served, prices ranging from one and

one-half cents to two cents per meal, owing to the number of meals served each day.

This contract, like the one between the construction company and the government, made no provision for charging the construction company's employees with the meals supplied them. Such a charge, however, was made, and the sums collected thereon were turned over to the construction company, or credited to its account. The charge made was thirty cents per meal, which was afterwards found to be less than the actual cost by fifteen cents per meal.

The government had on the grounds at all times an accounting officer, denominated a "field auditor." To prevent "duplication of forces," this officer took charge of the accounting between the construction company and the commissary company. He established a commissary warehouse in which all supplies purchased for the use of the commissary were received and from which they were disbursed as required for the immediate uses of the commissary company. The construction company seemed to have no connection therewith other than the duty of paying the bills. The method of operation, as described by the bookkeeper of the construction company, was substantially this: As a particular commodity became low in the warehouse, a request for an additional supply would be made by the commissary company on the field auditor. If he approved of the purchase, he would make out a requisition and send it to a purchasing agent. This agent would make the purchase and cause the commodity purchased to be shipped to the warehouse, where it would be examined as to quality and checked with the requisition. If found correct in these respects an order would be sent to the construction company authorizing payment. That company would thereupon send its check to the seller of the commodity for the amount of the purchase.

In August, 1917, the government ordered some fourteen hundred line officers to report at Camp Lewis for duty.  Notice of their coming was given the commander of the post on the day before the day they were due to arrive.  Officers of this character are required by the government to provide for their own subsistence, but, as it is well known locally, Camp Lewis is several miles distant from any point where such subsistence could be procured from independent sources, and no arrangement had been made by the government by which such subsistence could be procured at the camp.  In this emergency, the camp officer in charge called upon the commissary company and requested it to provide for messing the officers, assuring it that it could use for that purpose the facilities provided for messing the construction company's employees.  The commissary company undertook the work, and a rate per day to be charged the officers was agreed upon between the officer and the company.  The company arranged for messing the officers in buildings apart from those used in messing the construction company employees, and while it procured the supplies used in the messes from the general warehouse from which all the supplies were taken, separate accounts were kept thereof by the field auditor.  The construction company did not learn of the arrangement until some two weeks after it was consummated, the attention of its officers being then attracted to it by the rapid rise in the supply account.  Protest was then made against the arrangement by its officers, who were quieted by the assurance on the part of the camp officers of the government that the government would protect them against loss.  The commissary company also, acting under the permit given it by its contract, opened and conducted several stores at the site of the post, and also opened and conducted a public restaurant thereat.  In these it had a number

of employees, who took their meals at the mess houses conducted for the use of the construction company's employees. The business of providing messes for the officers, and the business of conducting and operating the stores, was wholly the private business of the commissary company, the construction company having no interest therein or anything to do therewith.

These conditions continued until some time in December, 1917, when the construction company completed its contract with the government. The field auditor at that time cast the accounts relating to the commissary between the construction company and the government. He found that the gross loss to the construction company in the operation of the commissary had been $130,260.74. Of this sum he conceived that $7,768.08, which the construction company had paid, represented items properly chargeable to the commissary company because of the independent businesses conducted by it, and disallowed the same, leaving a net balance due from the government to the construction company of $122,492.66.

From the first statement of the account submitted by the auditor it is impossible (for us at least) to gather the items that make up the total of the amount disallowed. In part the items were the following:

Construction work on buildings.............. $623.24
Overhead on expense account (proportion)... 2,517.80
Overhead on salaries account (proportion)... 4,906.82
Meals to employees of commissary company.. 1,400.85
Salaries ..................................    600.00

The item deducted for construction work was the cost paid by the construction company for labor and material used in fitting certain buildings (constructed for other purposes) with shelves, counters and other fixtures for use by the commissary company as stores. The items for overhead were a one-fourth part of the

total expenses paid by the contracting company for general services rendered the commissary company, and a one-fourth part of the salaries paid employees in the conduct of the commissary department. The item for meals was the auditor's estimate of the number of meals served to the employees of the commissary company who were employed in the conduct of its independent business. These were charged for at the rate of forty-five cents a meal, the average cost of the meals to the government. The item under the head "Salaries" was made up from salaries paid the officers of the commissary company, which the auditor conceived were not payable under the contract between the construction company and the commissary company; at any rate, not properly chargeable to the government.

From the total of the disallowances, certain fees for the service of meals were deducted, leaving the balance as stated.

A copy of the account was given the commissary company, whereupon its officers protested against the charges. It was then made the subject of further inquiry by the department at Washington and the account was recast. On the recast the finals remained the same, but there was a material change in the items making up the deductions. In the account as finally approved, the items were listed as follows:

Merchandise ............................ $1,801.50
Proportion of overhead expense.......... 1,876.31
Proportion of overhead salaries.......... 4,419.34
Meals to employees...................... 1,400.85
Truck services ......................... 118.50
Repairs to buildings.................... 623.34
                                        _____
    Making a total of....................$10,239.84
From this was deducted fees.............. 2,467.65
                                        _____
    Leaving a net balance of............. $7,772.19

This total, it will be observed, is $4.11 more than the total actually deducted. The bookkeeper of the construction company explained that this difference was probably the result of a transposition made when totaling the numerous items making up the account, which it was found more convenient to ignore than to run down. The item "truck services" was included in the "overhead expense" item in the original cast. No explanation was given to account for the remaining differences between the amounts of the "overhead" charges in the two statements, or for the omission from the latter of the salary item included in the first; these differences, however, were absorbed in part by the item in the recast account labeled "merchandise," and in part by the allowance made for fees. This recast account, so the officers of the commissary company testify, was never submitted to them.

In this action the construction company seeks to recover from the commissary company the amount of the disallowances made by the government auditor. In its complaint it set forth its contract with the government, its subcontract with the commissary company, and alleged in substance that the commissary company used the privileges accorded by the subcontract in the carrying on of businesses for its own benefit and emolument, other than the business provided for in its contract, causing the bills incurred in the operation of such businesses to be presented to and paid by it, along with other bills covered by the terms of the agreement between them, thereby becoming indebted to it in the sum of ten thousand two hundred thirty-nine dollars and eighty-four cents, no part of which had been paid, except the sum of two thousand four hundred sixty-seven dollars and sixty-five cents, and that the balance was due and owing. It further alleged that, on April 13, 1918, an account

of the indebtedness was stated between the parties, ''whereby said sum of $7,772.19 was found to be the balance due.'' It alleged also that, on or about March 10, 1918, the commissary company became insolvent and unable to pay its creditors in due course, or out of its tangible property, and thereupon, in violation of its duty in the premises, executed and delivered a general assignment of all of its property for the benefit of certain of its creditors, not including the plaintiff, to one E. G. Lindberg, with the intention of excluding the plaintiff from any participation in the division of its assets. Lindberg was not made a party defendant in the action. He, however, afterwards intervened and defended along with the commissary company.

In its answer the commissary company put in issue the allegations of the complaint tending to show liability on its part. It also set up an affirmative defense which need not be set out in detail. In substance, the defense was that the contracting company, in consideration of a receipt given it by the commissary company, promised to present a claim for the items sued upon in its own name to the government for allowance; that it failed so to do, although leading the officers of the commissary company to believe to the contrary; that, if the claim had been presented, it would have been allowed and paid, and that its loss was due solely to the negligence of the construction company.

The action was tried to the court sitting without a jury. The trial judge found that the commissary company had contracted, and the construction company had paid, the obligations which make up the items the auditor refused to allow the construction company in its settlement with the government, and that the obligations were incurred by the commissary company in the conduct of its private business, with which the

construction company had no connection and in which it had no interest. He found that the commissary company, "in the month of May, 1918, agreed in writing to pay to the plaintiff this sum of $7,772.19." He found that the commissary company later presented a claim to the government for the amount so disallowed, and that the government refused to consider it because not presented in the name of the construction company, with whom alone the government had contracted. He found that thereafter the commissary company informed the construction company of the action of the government and requested that the claim be presented in its name; that it was informed by the construction company that it then had other unsettled claims pending before the government, and that it believed the presentation of this claim would prejudice it in the prosecution of these claims, and refused to so present it. He found that it was reasonably probable that, had the claim been timely presented to the government in the name of the construction company, the same would have been allowed and paid. The sixteenth, seventeenth and eighteenth findings were as follows:

"The defendant sought to estop the plaintiff by showing that plaintiff had undertaken to present and prosecute a claim for the above mentioned balance to the government, and thereby procure its own reimbursement, and that it had not done so; but the court does not find that plaintiff did so undertake, and finds that if it had done so there was no consideration for its undertaking, and no bar therein to the prosecution of this action.

"Prior to the commencement of this action, defendant was an insolvent corporation, and was indebted to sundry creditors, not including plaintiff, for sums aggregating about $40,000; and to secure the payment of such indebtedness assigned all of its property to the intervenor, E. G. Lindberg, who took and now retains

all of said property except such as he has paid to said
creditors, and has been and now is carrying on defend-
ant's business, as such assignee, for the benefit of said
creditors who were not yet fully paid.

"Said Lindberg, from time when he took possession
of the property of defendant, being informed of the
claim of the plaintiff to be considered a creditor of
defendant, kept and reserved in his possession, out of
the receipts coming to him from the business of de-
fendant, a sum proportioned to the sums he paid to
the other creditors, to be paid to the plaintiff in case
it established its debt against defendant by this action;
which sum, on the 17th day of January, 1918, amounted
to $4,663.31, and which sum he stipulated to retain
for the use of plaintiff, to abide the event of this
action."

No direct finding was made on the issue of an ac-
count stated, but it is inferable from the findings as a
whole that the issue was determined against the con-
struction company.

On these findings the court entered a judgment for
the amount deducted by the auditor, this being four
dollars and eleven cents less than the total of the items
making up the amount. From the judgment so entered,
the commissary company and the intervener prosecute
this appeal.

The appellants first contend that the respondent's
cause of action is founded wholly upon an account
stated, and that there is in the record no evidence, or
inference arising from evidence, from which it can be
found that this account ever became an account stated
between the parties. From this the conclusion is
drawn that there was a failure of proof, and that the
judgment is erroneous, since, in effect, it is a judg-
ment unsupported by evidence. But to this we think
there are at least two sufficient answers. The first is
that the complaint states facts sufficient to constitute

· 15—111 WASH.

a cause of action, even if the allegations with reference to an account stated be disregarded. This being so, it may recover on this branch of its case, although the other is not proven. Nor is the complaint, by construing it as stating different grounds for recovery, made duplicitous. Under the practice in this state, where a plaintiff has two or more distinct grounds for the relief he asks, the one not inconsistent with the other, he may set them forth in his complaint in orderly sequence, and may recover if he proves any one or more of them. *Barto v. Nix,* 15 Wash. 563, 46 Pac. 1033; *Loveday v. Anderson,* 18 Wash. 322, 51 Pac. 463; *Hutchinson v. Mt. Vernon Water & Power Co.,* 49 Wash. 469, 95 Pac. 1023; *Bernot v. Morrison,* 81 Wash. 538, 143 Pac. 104; *O'Donnell v. McCool,* 89 Wash. 537, 154 Pac. 1090; *Starwich v. Ernst,* 100 Wash. 198, 170 Pac. 584; *Welch v. Northern Bank & Trust Co.,* 100 Wash. 349, 170 Pac. 1029.

The second answer is that to hold with the appellant's conclusion would be to deny the respondent the benefit of the statutes relating to amendments of pleadings. If the allegations of the complaint were wholly upon an account stated, and the evidence failed upon that ground but justified a recovery upon another, the respondent would have been entitled to amend so as to make its allegations conform to its proofs. This court is required, in appealed causes tried to it *de novo,* to regard all amendments as made which could have been made. Rem. Code, § 1752. The effect of the rule is to compel us, in all cases where there is a variance between the allegations of the pleadings and the proofs in evidence, to disregard the pleadings and treat the evidence as stating the issues between the parties. So, here, if it were true that the complaint was based wholly upon an account stated, and the proofs showed a right to recover upon another ground, the variance

is not fatal to the judgment, since the judgment may rest upon the proofs made.

The trial court found, it will be remembered, that the appellant commissary company, in May, 1918, agreed in writing to pay to the respondent the amount found due by the field auditor. This finding was based on a letter dated May 8, 1918, written by one Nathaniel Paschall to the accounting agent of the respondent in answer to letters from the agent demanding payment of the account. In this letter Mr. Paschall stated that he was endeavoring to get into communication with the officer of the government who had authorized the use of the facilities which resulted in the account, and his cooperation in presenting to the government a claim for reimbursement; adding:

"If this is allowed us, of course, we will make immediate settlement of your claim against our company. If, however, we are unsuccessful we will make partial settlement and will advise you when we can pay the balance."

It was shown by other proofs that Mr. Paschall was a stockholder in the appellant corporation and its duly elected secretary. But it was shown, also, that the letter was written after the corporation had become insolvent, after it had assigned its property for the benefit of its creditors, and after its assets had been taken into possession by the assignee named in the assignment. The appellant contends, we think correctly, that this evidence does not justify the finding. It is a general rule that contracts and agreements made by an officer of a corporation on behalf of the corporation are binding upon it only when the officer at the time represents the corporation and is authorized to act on its behalf. At this time Mr. Paschall did not represent the corporation in the sense that he

could add to its obligations or create new obligations for it chargeable against its existing property. The corporation was then insolvent. It had made an assignment of its property for the benefit of its creditors. The assignee and the creditors acquired an interest in the property of the corporation in virtue of the assignment. We think it plain that an officer of a corporation, whatever may have been his authority prior to an assignment for the benefit of creditors, cannot thereafter bind the corporation to a new agreement detrimental to the interests of the assignee and the creditors represented by him. To so hold would be to hold that the officers of a corporation could, after an assignment by the corporation for benefit of its creditors, destroy the interests the assignees acquired by the assignment. Treating this promise as an agreement on the part of the corporation to pay an obligation which it was not otherwise obligated to pay, we are clear that it was not obligatory as to the existing property, of the corporation in the hands of the assignee.

Whether the letter was admissible as a declaration or admission on the part of the corporation that the obligation sued upon was a just obligation of the corporation incurred prior to the assignment, so as to be chargeable against the property in the hands of the assignee and thus independent evidence of the fact sought to be proved, is a more troublesome question. In our opinion it was not. This, for the reason that it was not the act of the corporation, but the act of an officer who did not then represent its interests. Doubtless the officers of the corporation could testify that the obligation was just and was a proper charge against the property in the hands of the assignee. So, also, could they testify to the contrary. And had this par-

ticular officer testified that the obligation was not just, the letter could have been introduced to contradict or impeach his testimony, but neither of these considerations, we think, would justify the admission of the letter as evidence of an independent acknowledgment by the corporation of the debt.

It remains to inquire whether there was other evidence in the record from which the trier of fact can find that the indebtedness was established. As to the item for merchandise, the item for meals furnished employees, and the item for repairs of buildings, there is abundant evidence in the record to show that services of this sort were furnished, and that the obligations incurred thereby were obligations incurred for the private use of the appellant corporation. Since the appellant corporation caused them to be paid by the respondent, there arose on its part an implied promise that it would make the loss good to the respondent. The difficulty arises with the items themselves; that is, whether there is evidence from which it can be found that the items are just and represent the true balances due for articles delivered and services performed for which payment has not been made. The field auditor was not sworn, nor did any of the witnesses on the part of either party have knowledge of the true state of the account. But the auditor, in keeping the account, was the agent of both parties. Both assented, or at least acquiesced, in his so doing, and it was necessarily intended that, at the termination of the transaction, he should state the account between them. His statement is, therefore, as between the immediate parties to the transaction, and as between either of the parties and the assignee of one of them, admissible as evidence for or against either of them. No doubt the statement was subject to dispute

as to its correctness, but, being admissible as evidence, it must be taken *prima facie* as being correct. Nor can we find that it was impeached as to these particular items. True, as we have shown, there were two statements, each showing the same total, but differing in the items making up the total. But the power to cast the account includes the power to recast it, and since the recast is not impeached other than by showing a difference in the items, we are constrained to hold that it represents the true state of the account between the parties as to the items mentioned.

We have not overlooked the testimony of an officer of the appellant corporation to the effect that his corporation paid by its own checks for all of the items of merchandise taken from the commissary and applied to the private use of the corporation. It is no doubt true that the corporation did make payments on the account as they were called for by the field auditor, but as its information as to the state of the account from time to time was derived wholly from the auditor, it could not be known by any of the officers whether or not the payments made were payments in full. The account as a whole was large. It involved transactions approximating a half million of dollars. Much material was on hand when the account was ready to close, and its true state could hardly have been known, even to the auditor himself, until the final balance was struck. In view of these facts, we cannot think the evidence of the officer impeaches the auditor's statement.

In this connection the appellant contends that the rate charged for the meals furnished its employees is too large, since the cost is fixed at forty-five cents per meal instead of thirty cents, the rate charged the respondent's employees. But the rate was fixed at the

actual cost, and, in the absence of an agreement to the contrary, the appellant cannot be heard to say that it did not receive the benefit of the service to the extent of such actual cost.

The items for overhead, in which must be included the item for truck services, stand upon a different footing.  These were incurred, for the greater part at least, under a direct agreement with the government that the appellant could make use of the facilities which give rise to them without cost to itself.  By the terms of the contract between the government and the respondent, the government had an interest in the facilities used in these operations, and had agreed to reimburse the respondent for its expenditures in conducting the operations.  The government, therefore, had such a direct interest therein as to empower it to make contracts with reference to their use by another. Since it agreed with the appellant corporation that it could make use of them in messing the officers sent to the army post on the government's business, without charge, and agreed with the respondent that it should suffer no loss by reason thereof, there could arise no promise, either direct or implied, that the appellant would reimburse the respondent for such use, should the government repudiate its promise and charge the cost to the respondent, or, what is the same thing, refuse to allow the cost thereof in its settlement with it. It is not a case referable to the rule which permits a loss, which one of two innocent parties must suffer, to be charged to the party whose act causes the loss.  In this instance the appellant is equally innocent with the respondent in act and promise.  Both acted on the promise of the government's representative that no charge would be made for the use of the facilities which gives rise to the loss.  The appellant, because thereof, did not seek to protect itself against it; in fact,

its charges for the services rendered, in the performance of which it suffered an actual loss as it was, were based on a rate in the making of which this item was not considered. Plainly, we think, the government cannot, by repudiating the contract of its officers and charging the cost to the respondent, make it a charge recoverable by the respondent from the appellant.

With regard to the matter referred to in the sixteenth finding of the court, before quoted, we think the court in error in its findings of fact, but correct in its conclusions with regard thereto on the facts as they appear in the record. The respondent, as we read the evidence, did promise that, as soon as its own accounts with the government were finally adjusted, it would present this claim to the government in its own name on the appellant's behalf, and we think, further, there was a sufficient consideration for the promise. But we cannot conclude that the respondent intended thereby to relieve the appellant from its obligation, or postpone the time of its payment. On the contrary, it contended at all times that the obligation was the obligation of the appellant, but was willing to use its name and its friendly offices in an endeavor to have the government make good the loss to the appellant. The record shows in this connection that these claims had not been adjusted at the time of the trial, and hence no breach of the promise had then occurred.

The foregoing considerations lead to the conclusion that the respondent is entitled to recover from the appellant corporation the sum of the items set forth in the auditor's account under the heads "merchandise," "meals to employees," and "repairs to buildings," but that it is not entitled to recover for the other items listed. A proportionate share of the judgment is payable, of course, from the funds in the hands of the assignee.

The judgment is therefore reversed, and the cause is remanded with instructions to enter a judgment in accordance with this opinion.

HOLCOMB, C. J., MAIN, MOUNT, MITCHELL, PARKER, BRIDGES, and MACKINTOSH, JJ., concur.