[No. 30368. *En Banc.* October 25, 1948.]

EDMUND V. TWOHY, *as Executor, et al., Respondents and Cross-appellants,* v. SLATE CREEK MINING COMPANY, *Appellant,* HARRY P. KRAMER, *Respondent.*[1]

[1]Reported in 198 P. (2d) 832.

*Henderson, Carnahan & Thompson, Henry C. Perkins,* and *Rummens & Griffin,* for appellant and respondent Kramer.

*John J. Kennett,* for respondents and cross-appellants.

SCHWELLENBACH, J.—This is an appeal from a decree awarding Twohy, as executor, and Funkhouser, each, 62,500 shares of the common stock of Slate Creek Mining Company, and directing the corporation to deliver to each of the plaintiffs a stock certificate evidencing his ownership of said shares.

The cause was tried to a jury, but the court concluded that the cause was of equitable cognizance and treated the verdict of the jury as advisory only.

The complaint alleged the corporate existence of the corporation; that the plaintiff Twohy was the duly appointed and acting executor of the last will and testament of Edmund Paul Twohy, deceased; that Harry P. Kramer was, at all times mentioned, the president of the corporation, and was at all times actively engaged on behalf of the corporation in the development and exploitation of the properties of the corporation. (This was admitted by defendants.)

That, on November 5, 1940, the defendant Kramer, on behalf of the corporation, entered into an agreement with the law firm of Funkhouser and Twohy, by virtue of which Funkhouser and Twohy were to receive 20,000 shares of the common stock of the corporation in payment for services rendered up to and including that date. (This was admitted by defendants.)

That at said time and place, Kramer, acting for the corporation and for himself personally, agreed that Funkhouser and Twohy should continue to act as attorneys for the corporation, and should be paid for their services by the issuance of common stock of the corporation, the amount to

be determined at a later date; that Kramer agreed that, in consideration of Funkhouser and Twohy continuing as attorneys for the corporation, he would personally guarantee the payment to them from his personal stock of the amount due them, and would personally pay to them from his own stock such amounts as might be due them in the event the corporation failed to do so. (This was denied by defendants.)

That thereafter, on May 31, 1944, an accounting was had between Funkhouser and Twohy and Kramer, who was then and there acting on behalf of the corporation, and at said time and place Kramer agreed that there was due and owing to Funkhouser and Twohy, for services rendered, 125,000 shares of common stock of the corporation, and Kramer then and there promised that he would cause said shares to be delivered to Funkhouser and Twohy. (This was denied by defendants.)

By way of affirmative defense, defendants alleged:

That all of the services rendered by Funkhouser and Twohy to the corporation and to Kramer have been paid in full; that the alleged agreement of defendant Kramer as to the issuance of stock for services rendered subsequent to November 5, 1940, is unenforcible because it is contrary to the provisions of the statute of frauds, not being in writing.

That defendant Kramer was without power to make the alleged agreement, because all of the authorized common stock of the corporation had been issued prior to November 5, 1940; that, on that date and subsequent thereto, it had no unissued common stock; and that Twohy had full knowledge of this fact at that time and subsequent to the date of the alleged agreement. (This was all denied by plaintiffs.)

For a number of years Frank Funkhouser and Edmund Paul Twohy maintained a law partnership in Spokane under the name of Funkhouser and Twohy. Although they had a general practice, they specialized in mining law. They met Kramer in 1937. At that time, he was living in Montana and was engaged in promoting mining ventures. In 1939, he engaged the firm to prepare lease and option agreements

between the New Light Gold Mining Company and himself, and lease and option agreements between the Cascadian Engineering Company and himself.

On March 6, 1940, the Slate Creek Mining Company was organized, its principal place of business being 908 Old National Bank Building, Spokane, Washington (the office of Funkhouser and Twohy). It provided for 1,000,000 shares of common stock and 500,000 shares of preferred stock. The incorporators were Harry P. Kramer, Theodore G. Jenes, and George D. Bender. They subscribed for the following amount of stock: Kramer, 9,998 common, Jenes 1, Bender 1.

At a meeting of the board of directors held March 7, 1940, Kramer was elected president, Jenes, vice president, and Bender, secretary-treasurer. Kramer then presented his offer to assign to the corporation all of his right, title, and interest in the lease and option agreements with the New Light and Cascadian companies, in exchange for 990,000 shares of common stock and 150,000 shares of preferred stock in the corporation. This was accepted by the directors, and the stock issued to Kramer.

In October 1940, Jenes and Bender resigned, and Joseph Romano, John A. Andros, W. A. Custis, and M. S. Alexander became directors. Alexander was elected vice president and Custis, secretary-treasurer. Alexander put money in the corporation, and on October 10, 1940, 125,000 shares of common stock were issued to him by the company, the same being transferred from Kramer's stock. November 15, 1941, 482,500 shares of common stock were transferred to him by the same procedure. There is nothing in the record to indicate anything being paid for the 482,500 shares. Mr. Alexander testified that he paid the company, not Kramer, for the 125,000 shares. From time to time, stock in Kramer's name was transferred to various individuals until, in August, 1946, his common stock was down to 90,000 shares, at which time, this was augmented by 218,750 of Alexander's shares, making his total 308,750. No assignments of stock were executed by either Kramer or Alexander, the transfers merely

being made by the company, with notations that the shares were transferred from either Kramer's or Alexander's stock. Neither Kramer nor Alexander received any consideration for any of such transfers. In the stock register book, we find the following receipt of Mr. Custis, who succeeded Mr. Bender, as secretary:

"October 30, 1940

"Received of Geo. D. Bender, former Secretary of Slate Creek Mining Co., the following stock of the said corporation:

"Certificate Aug. 20, 1940. 150,000 Shares Preferred
"Certificate Aug. 20, 1940. 500,000 Shares Common

issued to Harry P. Kramer, but held in escrow pursuant to the requirements of the State of Washington under the Statutory Statement now on file with the State, the custody of the above stock now being transferred to the new Secretary of said Slate Creek Mining Co. to be thus further held in escrow. SLATE CREEK MINING Co.

"By W. G. CUSTIS [signed]
Secretary & Treasurer"

Subsequent to the organization of the company, Funkhouser and Twohy performed all of its legal services. During all of the time in controversy, they continued to do so, and the company had no other attorneys.

On November 5, 1940, Kramer met with Funkhouser and Twohy in their office in Spokane, and, after considerable discussion, the following memorandum was written:

"Funkhouser & Twohy          Spokane, Washington
"Attorneys at Law            November 5, 1940
"908 Old National Bank Building
"Spokane, Washington
"Gentlemen:

"This memorandum of our agreement, orally reached this day, is to acknowledge that for legal services rendered in connection with the formation and functioning of the Slate Creek Mining Company, of which I am President, your firm is entitled to twenty thousand (20,000) shares of the common stock for services rendered to this date.

"This settlement is just by way of an understanding and does not in any way terminate our present relations. So far

as my influence will prevail your firm will continue as counsel for the company.

"Respectfully,

"HARRY P. KRAMER [signed]

"President, Slate Creek Mining Co."

The stock was not issued until December, 1941, when the following letter was written by Mr. Twohy:

"Funkhouser & Twohy

"Attorneys & Counselors

"Old National Bank Building

"Spokane, Washington

"December 24, 1941

"Mr. W. G. Custis, Secretary

"Slate Creek Mining Company

"145 Horton Street

"Seattle, Washington

"Dear Mr. Custis:

"Mr. Funkhouser and myself want to acknowledge receipt of two certificates for 10,000 shares each of the common stock of Slate Creek Mining Company.

"In this connection, and to obviate any misconceptions, we are submitting herewith a copy of a letter dated November 5, 1940, in which you will observe that the shares in question were agreed upon for legal services rendered to that date.

"With the compliments of the Season, we remain

"Very truly yours,

"Funkhouser & Twohy

By E. P. Twohy [signed]

"Received Certificate No. 155 for 10,000 shares.

"FRANK FUNKHOUSER [signed]

"Received Certificate No. 156 for 10,000 shares.

"E. P. TWOHY" [signed]

Attached to the letter was a copy of the November 5, 1940, agreement. The 20,000 shares in question were transferred from Kramer's common stock.

After the agreement of November 5, 1940, Funkhouser and Twohy continued to act as attorneys for the corporation. Their work consisted of defending various suits against the corporation, legal advice from time to time, and contacts, on behalf of the corporation, by letter, telephone, and tele-

graph, and, at different times, either Funkhouser or Twohy were called over to Seattle in connection with the company business. Although the officials of the company have belittled their work, we are satisfied, from the record, that Funkhouser and Twohy, during this time, performed very valuable services on behalf of the corporation. Mr. Twohy died November 26, 1944, and from then on Mr. Funkhouser carried on.

On May 31, 1944, Kramer met with Funkhouser and Twohy in their office in Spokane. He sought advice regarding a pending transaction with Attorney Garvin, who had an assignment of fifty per cent of the stock of the New Light Mining Company as consideration for turning it over to Kramer. Kramer was attempting to buy this from Garvin. Mr. Funkhouser testified:

"A. So I said to Kramer 'Fifty percent is too much for picking up that old corporation.' I said, 'Mr. Garvin was willing to take $500 cash and 1000 shares of this new corporation for his stock.'

"Then I said to him, 'Mr. Kramer, Mr. Twohy and I have pulled you out of the mire on a number of occasions and I think we ought to get 25 percent of the common stock of this company. It would have been lost many times but for us.' Mr. Kramer looked up and said—he always used to call Mr. Twohy—he just said Mr. Twohy was the master legal mind west of the Mountains. He said 'Twelve and a half percent is enough.' And at that time Mr. Twohy was sick, so he slapped his knee and said 'Fair enough. You can work it up afterwards.'

"And Mr. Kramer walked out with him. That was the end of the conversation."

And again:

"Q. (By Mr. Kennett) From your testimony I am not quite clear what was said by Mr. Kramer or you or Mr. Twohy after Mr. Kramer suggested that 12½ percent of the stock was sufficient for your fee? A. You are talking of May 31st? Q. On May 31, 1944, yes. A. Mr. Kramer said,—when I told him we ought to have 25 percent Kramer said 'Twelve and a half percent of 125,000 shares of treasury—of the common stock of the company.' Then Mr. Twohy said 'Very well. Send the stock along.' Kramer said 'I will.' Then

he walked out and I never saw Mr. Kramer until last August."

Mr. Kramer denied that anything was said at that time about stock to be given to Funkhouser and Twohy. His testimony was that the first time any mention of fees was made, subsequent to November 5, 1940, was in Mr. Funkhouser's office August 29, 1946. At that time, Kramer had brought over a list of stock held by the directors, prepared by Custis, in order to qualify 100,000 shares with the SEC and also to obtain a state license to sell stock. As to that conversation, Mr. Kramer testified:

"A. He asked me 'How about our own fees now?' I told Mr. Funkhouser 'Your firm has done very well since 1940.' When Mr. Alexander, Mr. Custis and Mr. Andros had been associated with us, all of the business affairs had been conducted up to 1945 quite well. I was only just doing the managing work, working at the mine, I didn't take care of the bills, I never signed a check for the company, they were all signed by Mr. Alexander— . . . A. Then I told him, said 'If you think that you should get fees, you should have submitted a statement to the main office and they take care of all of our bills. They are paid promptly. We don't want them past due.' Mr. Funkhouser then said, 'I must have 100,000 shares.' I told him 'What for?' He said, 'Because if you don't give me that the Securities Commission is going to enter a stop order and you will never get this through.' Then I said 'Mr. Funkhouser, any time your own lawyer gets too big to talk to his client he should quit him.' . . . A. So I said 'When my own lawyer begins to use such talk to his client, it is time I quit him.' And I took my papers up and that is all that was said and I walked to the door and I said to Mr. Funkhouser, who was waiting at the door, 'I want to get out.' And I said there wasn't any agreement to give him any more stock. And he was right there and I decided to get around him, and so I picked all my papers up and I left."

He did admit that Funkhouser and Twohy handled the legal matters for him and for the company from 1939 to August, 1946.

On the other hand, Mr. Funkhouser's version of that conversation is as follows:

"Q. What did you say to him concerning your stock? A. How is that? Q. What did you say to him concerning your stock? A. I read this, turned it over, looked at it. It didn't have our stock on it, didn't have our 125,000 shares. I said 'Harry, where is our stock?' He said 'What do you mean?' I said 'Where is our 125,000 shares you promised to deliver to us the next time you came over?' 'Oh,' he said, 'I paid Mr. Twohy. I paid Mr. Twohy.' I said, 'What, how, by check? 'Yes, yes, by check.' I said, 'Have you got a cancelled check?' 'No, no. I mean by cash.' I looked at him and I got up and as I went around the table I said 'Do you mean to say my deceased partner has embezzled our fee?' And I said 'I am 62 years old but I can lick the hell out of you this minute. You get out of this office and stay out.' And as he went out I called him a dirty liar and he got out. . . . Q. Did you see him later that day, that evening? A. On that evening I went in the Davenport Hotel as he was going in or coming out. We met on the way going in the Davenport. There was little said between us concerning it. He wanted to know if we could settle it—he did say early in that conversation about what he paid Mr. Twohy. He said, 'I give you 5,000 shares for your services, I paid Mr. Twohy in cash.' And that was all he said about 10,000 shares and I walked out."

The trial court, in its decree, ordered that defendant Kramer be dismissed, and Twohy, as executor, and Funkhouser are appealing from that portion of the decree. We find nothing in the record which would warrant a judgment against Kramer, individually, and the portion of the judgment dismissing Kramer is affirmed. We shall therefore refer to Twohy, executor, and Funkhouser, as respondents, and to the mining company, as appellant.

Two questions are involved in this appeal: first, whether respondents have sustained the burden of proving the allegations of the complaint that an agreement was made to deliver to them 125,000 shares of the common stock of the corporation; and second, whether the corporation can be ordered to deliver stock to respondents, it having no stock in the treasury.

We are satisfied, from an examination of the entire record, and from an examination of the memorandum of Mr.

Kramer signed November 5, 1940, that that instrument was merely a settlement up to that time, for services rendered to the corporation by Funkhouser and Twohy. The agreement did not terminate the relationship then existing. We know that the firm continued as attorneys for the corporation up to August, 1946. It appears from the record that it was understood that the payment for any services rendered subsequent to November 5, 1940, would be made by the issuance of stock, rather than by a cash transaction.

But we fail to find, from the record, that an accounting was had on May 31, 1944, or that Kramer, at that time, agreed that there was due and owing to Funkhouser and Twohy, for their services, 125,000 shares of common stock of the corporation, and that he then and there promised that he would cause said shares to be issued and delivered to Funkhouser and Twohy.

As to this conversation of May 31, 1944, we have the testimony of Mr. Funkhouser and Mr. Kramer, which is in direct conflict. True, the jury decided this question of fact in respondents' favor, and we have held that we will not overthrow the findings of the trier of facts, unless the evidence clearly preponderates against such findings. But we feel that the evidence does clearly preponderate against such finding.

We know that, on November 5, 1940, when a settlement was made for 20,000 shares of stock, a written memorandum was executed. That was a verification by careful attorneys of an oral understanding. When the 20,000 shares were issued to Funkhouser and Twohy, Mr. Twohy acknowledged receipt and enclosed a copy of the original agreement. Had they, on May 31, 1944, received a promise of 125,000 shares of stock for their services, it is inconceivable that these careful attorneys would not have required a written memorandum from Mr. Kramer, evidencing that agreement. There is not one word in the record, either oral or written, from May 31, 1944, until August 29, 1946, making demand for the stock, or even mentioning such an agreement.

Exhibit No. 40 is a series of letters passing between Funkhouser and Twohy and the corporation, from June 28, 1944, to April 3, 1945. Considerable mention is made of transactions involving the expenses of Funkhouser and Twohy, but no mention is made of any agreement to transfer stock. On March 28, 1945, Mr. Funkhouser wrote:

"Mr. W. G. Custis, Treasurer
"Slate Creek Mining Company
"145 Horton Street
"Seattle, Washington
"Dear Mr. Custis:

"I am writing my good friend, Charlie Bartholet, asking for an extension of the permit, as per your letter of March 15th. I am sure there will be no difficulty about this.

"The monèy that you speak of from the Smelting Company was sent to Mr. Twohy and his trip to Bellingham was taken out of that and some other incidental expenses he had. We are trying to get his affairs straightened up and will write you and remit the balance. However, there was one trip that he made to Olympia that he made at his own expense that seemed to have been promised him by Mr. Kramer, but was never paid. However, we will have no difficulty about this. We have not heard from Kramer for a long time. I sent him a Christmas greeting to Chicago but it was returned.    Respectfully,

"FUNKHOUSER & TWOHY
"By Frank [signed]"

On March 29th, Mr. Custis replied:

"Mr. Frank Funkhouser
"Attorney and Counselor
"Old National Bank Building
"Spokane 8, Washington
"Dear Mr. Funkhouser:

"Thanks for your letter of March 28.

"To help you get Mr. Twohy's affairs straightened up, the Slate Creek Mining Company sent Mr. Twohy a check for $100.00 on August 15, 1944 for the purpose of making a trip to Bellingham to straighten up the company's affairs in regard to the suit. We believe this is the same trip that you mention in your letter.

"We have not heard from Mr. Kramer for a long time and do not know his present address. We presume he will be

showing up here in Seattle or dropping us a line in the very near future.

"Very kind regards.  Yours very truly,

"Slate Creek Mining Company

"By ................................................................................

Secretary-Treasurer"

Mr. Funkhouser replied April 3, 1945.

"Mr. W. G. Custis, Secretary

"Slate Creek Mining Company,

"145 Horton Street

"Seattle, Washington

"Dear Mr. Custis:

"We are sending you for your files the letter we have just received from the Department of Conservation and Development extending the Permit No. 1953 until July 1, 1947. If at that time it is necessary to get a further extension I am sure we can do so.

"As I have said heretofore, Mr. Twohy had complete charge of these lawsuits and I knew but little about them. I notice in his letter of June 28th, to which you refer, a footnote indicates that there will be several hundred dollars coming when the matters are settled up. The money that was received from the King County Clerk November 13, 1944 was in the sum of $130.54. Mr. Twohy paid Attorney Lewis M. Dawson out of that $3.00 for judgment fee and $15.00 for his services in getting this case settled, which would prevent an additional trip to Seattle, leaving the sum of $112.54. Mr. Twohy's letter of June 28th indicates it was necessary for him to go to Seattle and Bellingham to hear these cases and for that purpose he needed $100.00 and our files show that you sent this money and it was evidently used for this purpose.

"Nothing seems to be in the file indicating that the money was sent except your letter of October 20th. You state that it was sent on August 15th, but we find no letter in our file of that date. In addition to the trip to Bellingham to finally dismiss the case, after the trip that Mr. Twohy made in the summer, it required an additional trip, and hence a cost for that. When I come to Seattle I will bring the file and we will try and work out what difference is due you.

"Respectfully,

"Funkhouser & Twohy

"By        FF. [signed]"

■ We feel that respondents have failed to sustain the burden of proving that, on May 31, 1944, Mr. Kramer promised, on behalf of the corporation, to cause to be issued and delivered to them, 125,000 shares of common stock.

Having decided that respondents failed to prove the alleged agreement of May 31, 1944, it is not necessary to consider question number two. However, we are of the opinion that respondents are entitled to relief.

In its answer, appellant alleged that all of the services rendered to the corporation by Funkhouser and Twohy had been paid in full. However, in its reply brief it states:

"We call the Court's attention to the fact that neither the appellant, Slate Creek Mining Company, nor respondent, Harry P. Kramer has ever contended that the firm of Funkhouser & Twohy were not entitled to reasonable compensation for the services rendered. There is not one word of evidence concerning the value of the services of those lawyers. The suit was one for specific performance of an alleged contract."

■ 49 Am. Jur. 192, Specific Performance, § 170 states:

"The general rule that equity, having taken jurisdiction of a cause, will retain jurisdiction of the litigation and grant full relief is applied to actions for specific performance. Where a court of equity properly acquires jurisdiction of a cause for specific performance, it may go on to complete adjudication of all matters properly presented and involved in the case, even to the extent of adjudicating legal rights and granting legal remedies, as well as granting all appropriate equitable relief. Once the jurisdiction of equity has attached, it will itself proceed to round out the whole circle of the controversy, and decide every other contention connected with the subject matter of the suit essential to do complete justice. Damages may be awarded in a proper case either independently or in addition to a decree of specific performance."

■ In *Hurley-Mason Co. v. Pacific Commissary Co.*, 111 Wash. 439, 191 Pac. 624, we said:

"The second answer is that to hold with the appellant's conclusion would be to deny the respondent the benefit of the statutes relating to amendments of pleadings. If the allegations of the complaint were wholly upon an account

stated, and the evidence failed upon that ground but justified a recovery upon another, the respondent would have been entitled to amend so as to make its allegations conform to its proofs. This court is required, in appealed causes tried to it *de novo*, to regard all amendments as made which could have been made. Rem. Code, § 1752. The effect of the rule is to compel us, in all cases where there is a variance between the allegations of the pleadings and the proofs in evidence, to disregard the pleadings and treat the evidence as stating the issues between the parties. So, here, if it were true that the complaint was based wholly upon an account stated, and the proofs showed a right to recover upon another ground, the variance is not fatal to the judgment, since the judgment may rest upon the proofs made."

In *Coliseum Inv. Co. v. King County*, 72 Wash. 687, 131 Pac. 245, we reversed a judgment upon findings in favor of the plaintiff, in an action for rents collected and equitable relief. However, we said:

"It is first contended that plaintiff has no standing in equity. While the suit has been prosecuted as an equitable proceeding, the decree of the court is in effect a judgment at law, and it would serve no end to turn the respondent out of court when the right of the case can be determined and without doing violence to either party. The case is, after all, one of conversion, and if this court can direct a judgment at law, it will not deny relief because of the form of the pleadings. This is not denied by counsel. It is said in their brief:

" 'Plaintiff could have brought suit to recover compensation for said building; in other words, by trial of said action in a court before a jury. The plaintiff would receive the same measure of compensation that would have been granted at the hands of a board of appraisers, or at least the right of compensation would have been fully protected.' "

We then ordered:

"Inasmuch as the county has refused to arbitrate, either wilfully or because it has not the power, the case will be remanded with instructions to the lower court to direct the framing of an issue, and to call a jury to determine the value of the buildings, not for wreckage purposes, as suggested by counsel for appellants, but in view of the uses to which the county has put the property. That this issue may be more clearly presented, the pleadings may be amended."

Rem. Rev. Stat., § 1752 [P.P.C. § 5-95], provides:

"The supreme court shall hear and determine all causes removed thereto in the manner hereinbefore provided, upon the merits thereof, disregarding all technicalities, and shall upon the hearing consider all amendments which could have been made as made."

Although we hold that the alleged agreement of May 31, 1944, to issue and deliver to Funkhouser and Twohy 125,000 shares of common stock of the corporation, was not proved, the basis for making such a contract was clearly established. The agreement of November 5, 1940, was not a termination of the employment of the attorneys. It recognized that the relationship might continue. Relying upon that understanding, the attorneys continued to render valuable services to the corporation.

■■ The corporation was cognizant of the understanding upon receipt of Mr. Twohy's letter of December 24, 1941, enclosing a copy of the November 5, 1940, agreement. With knowledge of that understanding, the corporation continued to ask for and receive legal services from the law firm. The attorneys are entitled to be compensated for the reasonable value of their services. Where it clearly appears that a party is entitled to some relief, a court of equity, having taken jurisdiction of the cause, will, to avoid a multiplicity of suits, retain jurisdiction of the litigation and grant full relief to the parties, even though the issues were framed on another theory. *Biggs v. Gilbert-Tilbury Co.*, 106 Wash. 271, 179 Pac. 839.

The judgment is affirmed on the appeal of respondents and reversed on the appeal of appellant. The cause is remanded to the trial court with directions to determine the reasonable value of the services performed for the corporation by the firm of Funkhouser and Twohy, and to render judgment in favor of respondents, and against appellant, Slate Creek Mining Company, in such amount as it finds due. If it becomes necessary for the trial court to take additional testimony to ascertain the reasonable value of such services, it is authorized to do so.

No costs will be assessed in favor of either appellant or respondents against each other. Respondent Kramer will be allowed his costs against respondents Funkhouser and Twohy on their appeal against him.

STEINERT, ROBINSON, SIMPSON, and JEFFERS, JJ., concur.

MILLARD, J. (dissenting)—The jury found—that advisory verdict was accepted by the trial court—that Mr. Funkhouser's story of the transactions was true and disbelieved the contrary version by Mr. Kramer. The trial court and jury were in a better position than this court to pass on the facts, and we should respect their determination of the question of fact presented. The judgment should be affirmed on mining company's appeal and reversed on plaintiff's cross-appeal.

HILL, J. (concurring in part and dissenting in part)—I agree, for the reason stated in Judge Millard's dissent, that we should accept the version of Mr. Funkhouser regarding the agreement of May 31, 1944. It does not follow, however, that Mr. Kramer could, by such an agreement, bind the Slate Creek Mining Company to deliver 12½ per cent of its common stock to Messrs. Twohy and Funkhouser.

It is my view that, while the president of a corporation can obligate the corporation for attorneys' fees (*McKevitt v. Golden Age Breweries, Inc.*, 14 Wn. (2d) 50, 126 P. (2d) 1077), he cannot, without express authority so to do, obligate the corporation to pay attorneys' fees in corporate stock or any other medium except legal tender. There is here no evidence of express authority to agree to pay the attorneys for the corporation in stock, and, while ratification of the agreement to pay attorneys' fees may be inferred, there is no evidence from which a ratification of an agreement to pay them in corporate stock can be so inferred.

It may well be, as argued in the briefs, that attorneys who incorporate mining companies frequently take their compensation in whole or in part in corporate stock. However, we are here concerned with services rendered during a period four years subsequent to incorporation. For the benefit of

those members of the bar who prefer to be paid in coin of the realm, the rule should be—and I believe is—that an agreement to pay for legal services rendered a corporation in anything except legal tender is sufficiently unusual that it is not to be assumed that the president of a corporation has authority to obligate it to make payments in any other medium.

Since the Slate Creek Mining Company was not bound by the agreement made by Kramer, as its president, to deliver one hundred twenty-five thousand shares of stock to Twohy and Funkhouser, the decree of specific performance against the corporation should be reversed. Thus, I arrive at the same conclusion as the majority on that phase of this case, but for a different reason.

The majority affirmed the judgment of the trial court dismissing Kramer from the case. A substantial part of the services rendered by Twohy and Funkhouser had been for Kramer individually. The parties to the agreement knew that, if 125,000 shares of stock were to be delivered in accordance therewith, it must come from stock in Kramer's name or which he could dispose of as he pleased. I see no question of guaranty here. Kramer was not agreeing to guarantee a delivery of stock by the corporation; he was agreeing to "send the stock along." Specific performance of the agreement by Kramer should have been decreed.

MALLERY, C. J., and BEALS, J., concur with HILL, J.